[Nos. 31235-9-I; 32811-5-I.   Division One.   June 5, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES DONALD NEIDIGH, *Appellant*.

*In the Matter of the Personal Restraint of* JAMES NEIDIGH, *Petitioner.*

*Kevin Cole* and *Tam Bui* of *Washington Appellate Defender Association,* for Neidigh.

*David S. McEachran, Prosecuting Attorney,* and *Craig Chambers, Deputy,* for respondent.

BECKER, J. — On trial for one count of delivery of cocaine to an informant, James Neidigh denied his involvement. The State repeatedly asked him if the State's witnesses were lying, and defense counsel did not object. Neidigh appeals his conviction, contending that prosecutorial misconduct and ineffective assistance deprived him of a fair trial. We affirm the conviction and also deny relief from personal restraint.

I

Judy Edwards, a police informant, became engaged in conversation with Neidigh outside a bar in downtown Bellingham while police watched from nearby. Edwards testified at trial that when she asked Neidigh if he could buy her "a half" of cocaine for $40, he said he could. She gave him $40 in marked bills and followed him into the bar. There she saw him give the money to another person in exchange for two bindles. Outside, Neidigh handed Edwards the bindles, later found to contain cocaine. She put the bindles in her jacket pocket and took the jacket off, giving the police the prearranged signal that she had completed the deal.

Neidigh's testimony presented a different picture. He said that he and a friend were outside the bar looking for someone named Donovan to retrieve a jacket Donovan had borrowed. When Edwards asked him, "Do you know where to get a half?" Neidigh said no and asked her if she had seen Donovan. Edwards said she thought Donovan

was in the bar. She and Neidigh went inside. Donovan was not there. Neidigh went to the rest room. When he came back, he asked Edwards if she got what she was looking for. She said she had. Neidigh and Edwards then went outside to smoke. Neidigh handed Edwards a book of matches he had borrowed, and Edwards took off her jacket.

Detective Todd Ramsey had been watching from about 30 feet away. He testified that he saw Neidigh hand something to Edwards, but he did not see what it was. Detective Ramsey and Sergeant Kelsey arrested Neidigh after they saw Edwards take off her jacket. They found on Neidigh's person a small amount of change but no drugs or paraphernalia. Neidigh denied participating in a drug transaction. According to the officers, he told them, "If you don't have any money on me, you ain't got no case". At trial, Neidigh did not admit making this comment.

During cross-examination, Edwards acknowledged she was a recovering heroin addict and had been taking methadone daily for about four months. She had prior convictions for shoplifting and possession of stolen property and had been charged with two cocaine deliveries. The State had agreed to dismiss the delivery charges in return for her work as an informant.

## II

The prosecutor argued that the State was "relying on truth" and that Neidigh had concocted a fairy tale.

■ A prosecutor may not offer a personal opinion of witness veracity. *State v. Stith,* 71 Wn. App. 14, 19, 856 P.2d 415 (1993). However, the prosecutor "certainly may comment on the credibility of witnesses". (Footnote omitted.) *State v. Kwan Fai Mak,* 105 Wn.2d 692, 726, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986); *see State v. Wright,* 76 Wn. App. 811, 825, 888 P.2d 1214 (1995). The above comments were reasonable inferences from the evidence, within the bounds of proper argument.

Also during closing argument, the prosecutor focused on Neidigh's reported statement, "If you don't have any

money on me, you ain't got no case". The prosecutor suggested this sounded "like the statement of a person involved with street-level drug sales" whose mode of doing business was deliberately designed to minimize evidence and who "was, in fact, gloating about those facts to the arresting officer". Neidigh now contends this argument implied that he was an experienced drug dealer, for which there was no evidence in the case.

■ In *Stith,* the prosecutor commented that the defendant "was out of jail for a week and he basically was just resuming his criminal ways. He was just coming back and he was dealing again". This was so prejudicial that a curative instruction could not have neutralized it. *Stith,* 71 Wn. App. at 16, 21-23. But the prosecutor's comment in *State v. Barrow*—"anybody knows that if you don't want to get caught, you don't carry more than you absolutely have to"—was found to be based on "common sense" and not on facts outside the evidence. *State v. Barrow,* 60 Wn. App. 869, 873, 874, 809 P.2d 209, *review denied,* 118 Wn.2d 1007 (1991). The argument here comes closer to that in *Barrow.* Even if improper, it was less flagrant than the argument rejected in *Stith* and thus does not sink to the level permitting review for the first time on appeal.

Of greater concern are the efforts of the prosecutor, Craig Chambers, to get Neidigh to say on cross-examination that Edwards and the police were lying:

Q [Detective Ramsey] and Sergeant Kelsey invented the last part that said "If you ain't got the money, you ain't got no case?"

A I started just like that. I said, "I, I haven't got no money."

Q Well, were Sergeant Kelsey and Detective Ramsey . . . just not remembering correctly?

A I have no idea what their motives are.

Q What about Judy Edwards in her motive for setting you up. What motive would she have to do that?

A I think it was admitted into evidence.

Q Nothing personal about you, though?

A No. It's just—I don't know. I have no idea why she would do that to me. She didn't know and probably I don't know. I have no idea why she would do that.

Q It kind of reminds me of the plot to kill President Kennedy; doesn't it? Everyone down there is conspiring to get old Mr. Neidigh, right?

A Why is everyone trying to get Mr. Neidigh?

Q Well, Detective Kelsey and Ramsey are hearing things that you don't say; isn't that right?

A Well, I don't know. I don't know why they said it.

Q Judy Edwards is busting people right and left all day down there. She doesn't know you from a hill of beans and she is absolutely lying and setting you up and trying to get you arrested for drug charges. That's what you're accusing her of doing; aren't you, Mr. Neidigh?

A Well, I don't know. I don't know why she would do it. All I know is maybe she was trying to protect the source.

■ It was misconduct for the prosecutor to ask Neidigh whether the informant was "absolutely lying", whether testimony was "invented", and whether witnesses were "conspiring to get old Mr. Neidigh". *See State v. Green,* 71 Wn.2d 372, 380-81, 428 P.2d 540 (1967); *Wright,* 76 Wn. App. at 821-22; *State v. Carter,* 74 Wn. App. 320, 331, 875 P.2d 1, *review granted,* 125 Wn.2d 1007 (1994); *State v. Suarez-Bravo,* 72 Wn. App. 359, 366-68, 864 P.2d 426 (1994); *Stith,* 71 Wn. App. at 19-20; *State v. Stover,* 67 Wn. App. 228, 231, 834 P.2d 671 (1992), *review denied,* 120 Wn.2d 1025 (1993); *State v. Castaneda-Perez,* 61 Wn. App. 354, 362-63, 810 P.2d 74, *review denied,* 118 Wn.2d 1007 (1991). This type of question places "irrelevant information before the jury and potentially prejudices the defendant". *Wright,* at 821.

The court at oral argument asked why prosecutors continue to pose "liar" questions notwithstanding the cases cited above. Mr. Chambers, on behalf of the State, responded, "it's always been found to be harmless error" when no objection is raised and that this kind of cross-examination is "never really very important to the case".

The practice of asking one witness whether another is lying "is contrary to the duty of prosecutors, which is to seek convictions based only on probative evidence and sound reason". *Casteneda-Perez,* 61 Wn. App. at 363. Nevertheless, misconduct is prejudicial only when, in context, there is a substantial likelihood that it affected the jury's verdict. *Stith,* 71 Wn. App. at 19. Without a proper objection, request for a curative instruction, or a motion for mistrial, the defendant cannot raise the issue of misconduct on appeal unless it was so flagrant and ill intentioned that no curative instruction could have obviated the resulting prejudice. *State v. Echevarria,* 71 Wn. App. 595, 597, 860 P.2d 420 (1993). Liar questions and comments are held to be harmless if they "were not so egregious as to be incapable of cure by an objection and an appropriate instruction to the jury". *Stover,* 67 Wn. App. at 232. Here, a timely objection would have cured the problem, but no objection was raised.

"Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal". *State v. Madison,* 53 Wn. App. 754, 763, 770 P.2d 662, *review denied,* 113 Wn.2d 1002 (1989). If the failure to object could have been legitimate trial strategy, it cannot serve as a basis for a claim of ineffective assistance. *State v. Kwan Fai Mak,* 105 Wn.2d 692, 731, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986). In this case, defense counsel's failure to object may have been strategic. Neidigh stood up well to the improper questioning. He refused to agree that the State's witnesses were lying or incorrect. His answers made sense, and defense counsel's argument aimed at defusing the liar questions also made sense.[1] Counsel may have concluded that it was preferable to let the jury hear

---

[1]Defense counsel said:

"Now I'm not coming in here and accusing police officers of lying or making things up. I'm just trying to make a very simple point, that when exciting things are going on people hear what is said and so on in different ways, and I challenge you to try to decide whether anybody that was a witness to this par-

Neidigh's confident answers rather than to stop the questions.

Concerns with "liar" questions led to reversal of a conviction for possession of heroin with intent to deliver in *State v. Padilla:*

> In the end, the case essentially turned on the credibility of the two witnesses. In such a swearing contest, the likelihood of the jury's verdict being affected by improper questioning is substantial.

*State v. Padilla*, 69 Wn. App. 295, 302, 846 P.2d 564 (1993). The reason *Padilla* does not compel us to reverse in this case, though it involves a similar swearing contest, is that Padilla's attorney made a timely objection to the improper argument, and the court overruled it. Here, defense counsel did not object.

Neidigh asks this court to inquire whether repeated misconduct, such as occurred in this case, amounts to manifest constitutional error that he may raise for the first time on appeal under RAP 2.5(a) and *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992). We see no need to replace the "flagrant and ill-intentioned" test for misconduct with the test for manifest constitutional error. Both require a strong showing of prejudice, which Neidigh has not satisfied.

■ Accordingly, the prosecutorial misconduct that occurred here is not reviewable. The result shows the State is technically correct in relying on the doctrine of harmless error to save many convictions from reversal, especially where the defense raises no objection. Strong policy reasons support the use of harmless error analysis. "A judicial system which treats every error as a basis for reversal simply could not function because, although the

---

ticular conversation during an arrest and so on, whether anybody can come in here and tell you with exact precision exactly what was said. . . .

". . . Again, I'm not accusing [Detective Ramsey] of lying. I'm accusing him of being a normal human being like anyone else capable of making mistakes, capable of perhaps not remembering things correctly, capable of overlooking things, capable of being mistaken about what he saw."

courts can assure a fair trial, they cannot guarantee a perfect one". *State v. White,* 72 Wn.2d 524, 531, 433 P.2d 682 (1967). A reversal should occur only when the reliability of the verdict is called into question.

But the State is incorrect in its view that improper cross-examination of this type is "never really very important to the case". As a practical matter, if that were so, prosecutors would not waste their time planning such questions. As a legal matter, as shown by the result in *Padilla* and *Suarez-Bravo,* courts recognize that forcing the defendant into the role of accuser has the potential for turning a close case against the defendant.

And so we reject the suggestion, implicit in the State's argument, that courts must and do wink at intentional and repeated unfair questioning by prosecutors under the rubric of harmless error. The tactics at issue are creating problems on appeal in far too many cases. Questions designed to force witnesses to accuse each other are out of bounds—as are inflammatory remarks, incitements to vengeance, exhortations to join the war against crime or drugs, comparisons to notorious criminals, name-calling, appeals to prejudice, patriotism, wealth, or class bias, comments on the defendant's failure to testify or exercise of another constitutional right, improper remarks about defense counsel, and hints of violence, crimes, or important inculpating information that has been kept out of evidence. *See* Bennett L. Gershman, ch. 10, *Forensic Misconduct* (1994).

The most obvious responsibility for putting a stop to such conduct lies with the State, in its obligation to demand careful and dignified conduct from its representatives in court. Equally important, defense counsel should be aware of the law and make timely objection when the prosecutor crosses the line.

When the prosecutor fails to exercise restraint, and the defense lawyer fails to object, should the trial court intervene? The answer necessarily depends on the circumstances. Our comments on this subject should serve as a

reminder of the responses available to trial judges within the present framework. They are not to be taken as a holding or as an indication of movement toward a different rule of law. It would be unwise to *require* a trial court to intervene without an invitation by defense counsel, since the absence of a defense objection may be the result of a deliberate defense strategy to let the State embarrass itself. Sometimes, however, the absence of a defense objection may be the result of incompetence, or may stem "from the attorney's fear that an objection would only focus attention on an aspect of the case unfairly prejudicial to his client". *United States v. Sawyer,* 347 F.2d 372, 374 (4th Cir. 1965). Where this is manifestly the case a judge may choose "to interrupt, admonish the offender and instruct the jury to disregard the improper argument". *Sawyer,* at 374. A different approach is "to call the prosecutor to the bench, admonish him, and ask defense counsel if he wishes an instruction". Gershman, § 13.2(b)(1), at 13-10. A third approach is an order in limine against specific misconduct that the trial court may be able to anticipate based on its own experience or the tendencies of the case.

Misconduct that occurs in the face of a warning is a violation that the trial court may address with contempt sanctions. *See* RCW 7.21.050. The virtue of contempt as a sanction is that it "can be easily administered, interferes only marginally with the criminal proceeding, punishes the prosecutor rather than society, and can be adjusted according to the severity of the misconduct". Gershman, § 13.3, at 13-13. A further virtue is that the appellate court then has the opportunity to affirm the application of an effective remedy without circumventing or altering the harmless error inquiry.

## III

■ Pro se, Neidigh also contends his trial counsel was ineffective in failing to move to suppress the cocaine. The cocaine was recovered from the informant, not from Neidigh. Neidigh had no legitimate expectation of privacy in

it and therefore no standing to obtain its suppression. *See State v. Foulkes*, 63 Wn. App. 643, 647, 821 P.2d 77 (1991).

In his personal restraint petition, Neidigh asserts that his counsel failed to call certain witnesses whose testimony, according to Neidigh, would have been helpful. The attorney told Neidigh the witnesses could be more harmful than helpful; his decision not to call them was thus tactical. *See In re Jeffries*, 110 Wn.2d 326, 333, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988). The claim of ineffective assistance lacks merit for the further reason that Neidigh has failed to demonstrate what the witnesses would say. *See In re Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 121 L. Ed. 2d 344 (1992).

Neidigh further contends that the State intentionally withheld from discovery the fact that Edwards, the informant, was under the influence of methadone during her testimony and during the events to which she testified.

Neidigh has not demonstrated how he was prejudiced by the alleged pretrial failure to disclose. At trial, Neidigh's attorney did bring up Edwards' methadone, cocaine and heroin use in attacking her credibility. Neidigh now argues that methadone can affect a person's perceptual abilities, and had he known about the informant's methadone use earlier, he would have been able to introduce expert testimony on this subject. He has offered no affidavits from experts regarding this claim, nor has he shown that this information tended to negate his guilt or mitigate the offense. *See* RPC 3.8(d). Thus, Neidigh has failed to carry his threshold burden of proof in a personal restraint proceeding. *See Rice*, 118 Wn.2d at 884.

The judgment is affirmed. The petition for personal restraint is denied.

KENNEDY, A.C.J., and COLEMAN, J., concur.