143 P.3d 838 (2006)
STATE of Washington, Respondent,
v.
Rojel PEREZ-MEJIA, Freddie Dominquez, Defendants, and
Joel Soto-Rodriguez, and each of them, Appellant.
No. 54544-2-I.
Court of Appeals of Washington, Division 1.
September 18, 2006.
*839 Gregory Link, Susan Wilk, Washington Appellate Project, Seattle, WA, for Appellant.
Lee Yates, King County Prosecutor's Office, Seattle, WA, for Respondent.

*840 PUBLISHED IN PART
DWYER, J.
¶ 1 On a White Center street, Margaret Emmitt saw violence unfolding and tried to intervene as a peacemaker. Witnesses to the confrontation, including two of its participants, described an escalating argument between two opposing groups, each comprised of two men, who were heatedly exchanging insults, belligerent gestures, and references to their respective gang affiliations before Ms. Emmitt interceded. Unfortunately, the men did not heed her appeal for calm. One of the men produced a pistol and repeatedly fired towards his adversaries, senselessly killing Ms. Emmitt instead.
¶ 2 Both the shooter, Rojel Perez Mejia, and his cohort Freddie Dominguez pleaded guilty to second degree murder for their roles in Ms. Emmitt's death, and are serving sentences of imprisonment.
¶ 3 Joel Soto-Rodriguez, an acquaintance of Perez-Mejia and Dominguez whose role in the shooting, if any, is less clear, was charged with first degree murder with a firearm enhancement arising from the killing. This appeal is taken from the judgment entered on the jury's verdict finding Soto-Rodriguez guilty as charged.
¶ 4 After a careful review of the trial record and the appellate arguments of counsel, we arrive at the inescapable conclusion that Soto-Rodriguez's trial was marred by the prosecutor's inflammatory closing argument. The inappropriate argument was so egregious as to constitute prosecutorial misconduct, the appeals to passion and prejudice therein having compromised the fairness of the trial. As a result, Soto-Rodriguez's conviction must be reversed and the case remanded for a new trial.[1]

FACTS
¶ 5 Shortly after 2 a.m. on May 4, 2003, Ivan DeJesus and Juan Viellmas were standing on the sidewalk in front of a White Center dance club, awaiting their companions who were inside the club. Rojel Perez-Mejia and Freddie Dominguez approached DeJesus and Viellmas from the other side of the street, made gang-related hand signals, stated that they belonged to the gang Mara Salvatrucha (MS), and insulted a rival gang, the Vatos Locos (VL).[2] In response, Viellmas insulted the MS. DeJesus and Viellmas challenged Perez-Mejia and Dominguez to a fight.
¶ 6 Ms. Emmitt placed herself between the two groups to try to stop the fight. Perez-Mejia, who wore a leather glove on his right hand, pulled a pistol from his waistband with that hand and fired several shots. Ms. Emmitt was hit by two bullets from the pistol. Medics later transported Ms. Emmitt to Harborview Hospital, where she died from her injuries.
¶ 7 Shortly after the shooting, an eyewitness telephoned the police to report that Dominguez was in a gas station approximately one block from the scene of the shooting. Dominguez was detained by King County Deputy Sheriff Jason Milne, and was subsequently placed under arrest.
¶ 8 On May 15, 2003, Detective Gies and Deputy Vowell, both from the King County Sheriff's Office, interviewed Soto-Rodriguez, who was in custody on an unrelated matter, after advising him of his Miranda[3] rights.
¶ 9 During the interrogation, Soto-Rodriguez stated that, on the night of Ms. Emmitt's murder, he (1) drove to the dance club with Perez-Mejia and Dominguez; (2) observed a confrontation between Perez-Mejia, *841 Dominguez, and two other men; (3) had a beer bottle in his hand at the time of the confrontation, which he set on the curb after the shooting; (4) saw a woman get between the four men; (5) heard shots fired; and (6) left the scene.
¶ 10 On June 12, 2003, King County sheriff's deputies arrested Perez-Mejia. He confessed that he had fired the shots that killed Ms. Emmitt. He stated that Dominguez and Soto-Rodriguez had encouraged him to use violence against rival gang members, and that Soto-Rodriguez supplied the gun. In addition, he told the officers that Nelson Andrade-Soriano and Manuel Aguilar-Segovia were present during both the shooting and the events that led up to the shooting. Perez-Mejia stated that he, Dominguez, Soto-Rodriguez, Andrade-Soriano, and Aguilar-Segovia were all members of MS, and that the shooting was part of a dispute between MS and a rival gang.
¶ 11 Perez-Mejia, Dominguez, and Soto-Rodriguez were all charged with first degree murder with a firearm sentence enhancement arising from Ms. Emmitt's death. Perez-Mejia and Dominguez subsequently pleaded guilty to reduced charges of second degree murder.
¶ 12 Soto-Rodriguez was tried by jury in King County Superior Court.

Prosecution Witnesses
¶ 13 At Soto-Rodriguez's trial, eyewitness Julio Betancourt testified that, in the early morning of May 4, 2003, he saw two men on one side of Sixteenth Avenue Southwest get into an argument with two men on the other side of the street. He saw a woman intervene. Next, he saw one of the men on the east side of the street step back, pull out a gun, and shoot at the other men. He saw the woman fall to the street. Betancourt also saw a fifth man at the scene whose association with both pairs of men was unclear to him. That man was holding a beer bottle, which he placed in his clothing after the shooting.
¶ 14 Eyewitness Heidi Peterson testified that, shortly after 2 a.m. on May 4, 2003, she was driving on Sixteenth Avenue Southwest and thought she had come upon a riot. She observed between twenty and thirty people outside of a nightclub. She saw a man smash a bottle into the window of an oncoming car. She then put her car in reverse and backed away. While so doing, she saw a man fire a pistol toward people in the center of the street. She ducked. When she looked up again, she saw Ms. Emmitt lying in the street.
¶ 15 The shooter's intended targets, DeJesus and Viellmas, also testified. Both men described being outside of the nightclub for approximately one hour before the shooting, and immediately thereafter. Both men described seeing two other men approach them from the opposite side of the street, making gang-related hand signals. Both described challenging the other two men to a fight. DeJesus testified that one of the other men pulled out a gun and started shooting.
¶ 16 DeJesus testified that Soto-Rodriguez walked into the nightclub with two women less than thirty minutes before the shooting, and that he did not perceive Soto-Rodriguez to be involved in either the shooting or the preceding argument.
¶ 17 Andrade-Soriano also testified. He stated that he was at the nightclub the night of the shooting. He testified that he was confronted by members of the rival "18th Street gang," who told him that a member of MS had hit a member of their gang the week before, and that they intended to kill the MS member who had attacked their associate.[4] Andrade-Soriano testified that he telephoned Dominguez from the club to report this conversation, and then went to Soto-Rodriguez's house, where he met up with Soto-Rodriguez, Dominguez, Perez-Mejia and Aguilar-Segovia.
¶ 18 Andrade-Soriano further testified that he, Dominguez, Soto-Rodriguez, Aguilar-Segovia, and Perez-Mejia got into a car and drove back to the club. Andrade-Soriano *842 testified that Soto-Rodriguez told the men where to stand and when to display gang-related hand signals when they confronted the rival gang members. Upon arrival, all except Aguilar-Segovia, who was driving, exited the car near the club. Andrade-Soriano stated that he waited on the corner, Dominguez and Perez-Mejia walked up one side of the street, and Soto-Rodriguez stayed on the other.
¶ 19 Andrade-Soriano testified that Dominguez and Perez-Mejia then approached two men and made gang-related hand signals, that Soto-Rodriguez threw a bottle at a car, and that Perez-Mejia shot Ms. Emmitt.
¶ 20 Aguilar-Segovia also testified. He stated that, in the early morning of May 4, 2003, he drove from Soto-Rodriguez's house to the club, and that Soto-Rodriguez, Dominguez, Perez-Mejia and Andrade-Soriano were in the car. Aguilar-Segovia heard Soto-Rodriguez ask "who is going to do it?" and heard some of the others reply, "I will."[5] Aguilar-Segovia testified that Soto-Rodriguez produced a pistol, that Dominguez and Perez-Mejia both asked for the pistol, and that Soto-Rodriguez passed the pistol to Perez-Mejia. Aguilar-Segovia stated that he dropped the other men off by the club and drove around the corner.
¶ 21 Christina Devitt testified that she was at a party at Soto-Rodriguez's home on that same night, along with her sister Lisa Devitt, Dominguez, Perez-Mejia, Aguilar-Segovia, Soto-Rodriguez, Jessica Rodriguez,[6] and Chelsea Jensen. She testified that when Andrade-Soriano telephoned Dominguez, Dominguez started yelling. After Dominguez hung up the telephone, Devitt saw Soto-Rodriguez, Dominguez, Perez-Mejia and Aguilar-Segovia rush to leave. She also saw "a quick flash" or a "glimpse" of a gun.
¶ 22 Chelsea Jensen testified that she was also at Soto-Rodriguez's home with Jessica Rodriguez, Lisa and Christina Devitt, Dominguez, Perez-Mejia, Aguilar-Segovia, and Soto-Rodriguez on the same night. She testified that at one point in the evening Dominguez, Perez-Mejia, Aguilar-Segovia, and Soto-Rodriguez left the party. She testified that before the men left, Soto-Rodriguez handed a gun to Perez-Mejia, and that Perez-Mejia had the gun when the men left the house. When Soto-Rodriguez returned to his house, he appeared to be exhausted.
¶ 23 Jessica Rodriguez testified that, on the morning of May 4, 2003, Soto-Rodriguez returned approximately two hours after the men had left.

Defense Witnesses
¶ 24 Soto-Rodriguez testified at trial and also presented the testimony of Amber Dawn Clift, Katia and Brenda Lugo-Olivas, and Elpido Villegas-Trejo.
¶ 25 Clift testified that, on the night of May 3, 2003, she saw Perez-Mejia at a party in Ballard before he departed for Soto-Rodriguez's house in Burien, and that he had a holstered gun in his waistband.
¶ 26 Villegas-Trejo, a friend of DeJesus and Viellmas, testified that he witnessed the shooting and the preceding argument. Villegas-Trejo testified that he saw DeJesus with a bottle in his hand and heard the sound of a bottle striking the window of a car. He did not recognize Soto-Rodriguez and said he had not seen him anywhere near the argument or the shooting.
¶ 27 Katia and Brenda Lugo-Olivas each testified that when they left the nightclub at approximately 2 a.m. on May 4, 2003, they ran into Soto-Rodriguez just outside of the door to the club. While they were conversing, they heard gunshots and fled.
¶ 28 Soto-Rodriguez testified that he went to the nightclub sometime between one and two a.m. on the night of May 4, 2003, to look for some of his friends. He stated that he went into the club, and that, on his way out, he encountered his ex-girlfriend Katia and her sister, Brenda. While they were conversing, they heard gunshots.
¶ 29 Soto-Rodriguez further testified that the next morning Andrade-Soriano came to Soto-Rodriguez's house looking for Dominguez and Perez-Mejia. Andrade-Soriano *843 told Soto-Rodriguez that there had been a problem outside the nightclub the night before, and that Perez-Mejia started a confrontation and shot someone.

DISCUSSION

I. Prosecutorial Misconduct
¶ 30 In closing argument, the prosecutor appealed to the jury's passions and prejudices, urging jurors to base a guilty verdict on a goal of sending a message to gangs or taking part in a mission to end violence, rather than returning a verdict based upon a consideration of the evidence properly admitted in the case. The majority of this improper argument followed a timely objection interposed by Soto-Rodriguez's counsel. The trial court overruled this objection and, thus, no curative instruction was given. We conclude that the prosecutor's improper argument irreparably damaged the fairness of the trial and diminishes our confidence in the verdict reached. As a result, Soto-Rodriguez's conviction must be reversed, and a new trial held.
¶ 31 Prosecutors have a duty to seek verdicts free from appeals to passion or prejudice. State v. Belgarde, 110 Wash.2d 504, 507, 755 P.2d 174 (1988); State v. Echevarria, 71 Wash.App. 595, 598, 860 P.2d 420 (1993).[7] Accordingly, a prosecutor engages in misconduct when making an argument that appeals to jurors' fear and repudiation of criminal groups or invokes racial, ethnic, or religious prejudice as a reason to convict. Belgarde, 110 Wash.2d 504, 755 P.2d 174. Likewise, inflammatory remarks, incitements to vengeance, exhortations to join a war against crime or drugs, or appeals to prejudice or patriotism are forbidden. State v. Neidigh, 78 Wash.App. 71, 79, 895 P.2d 423 (1995).[8] In closing argument, a prosecuting attorney has wide latitude to draw and express reasonable inferences from the evidence. State v. Hoffman, 116 Wash.2d 51, 94-95, 804 P.2d 577 (1991). However, a prosecutor may never suggest that evidence not presented at trial provides additional grounds for finding a defendant guilty. State v. Russell, 125 Wash.2d 24, 87, 882 P.2d 747 (1994) (citing United States v. Garza, 608 F.2d 659, 663 (5th Cir.1979)).
¶ 32 A defendant alleging improper argument on the part of the prosecutor must establish both the impropriety and the prejudicial effect of the argument. Russell, 125 Wash.2d at 85, 882 P.2d 747. To be entitled to relief, the defendant must demonstrate a substantial likelihood that the misconduct affected the jury's verdict. State v. Reed, 102 Wash.2d 140, 145, 684 P.2d 699 (1984). The allegedly improper arguments must be reviewed in the context of (1) the total argument; (2) the issues in the case; (3) the instructions, if any, given by the trial court; and (4) the evidence addressed in the argument. Russell, 125 Wash.2d at 85-86, 882 P.2d 747.

A. The total argument
¶ 33 In this case, the argument, considered in totality, was inflammatory. In closing, the prosecutor stated:
[We can] pick up the torch that Ms. Emmitt had been carrying. . . . We can continue *844 her mission to try to stop this violence that has occurred.
Now, although you as ladies and gentlemen of the jury will not be placed in harm's way, you will not physically be in the middle of a war as Ms. Emmitt was, you will not have someone behind you pointing a loaded gun at your back as Ms. Emmitt was. But what you can do as ladies and gentlemen of the jury is send a message.
¶ 34 At this point, Soto-Rodriguez's counsel interrupted the argument, stating, "Objection to call for messages."[9] The trial court overruled the objection.
¶ 35 The prosecutor continued:
Send a message to Scorpion,[10] to other members of his gang . . . and to all the other people who choose to dwell in the underworld of gangs. That message is we had enough. We will not tolerate it any longer. That we as citizens of the State of Washington and the United States of America, we have the right to life, liberty and the pursuit of happiness and we will no longer allow those who choose to dwell in the underworld of gangs to stifle our rights. And that message begins now.
It begins now by finding that the defendant was involved in the death of Ms. Emmitt. That message can be sent by holding the defendant responsible for his actions, for his involvement in the gang. For him being an accomplice to his other gang members in the death of Ms. Margaret Emmitt.
¶ 36 This argument improperly invoked the jurors' patriotic sentiments and, having done so, cast the defendant as an oppressor of the inalienable rights listed in our nation's Declaration of Independence. These appeals to prejudice and patriotism were unquestionably improper. Neidigh, 78 Wash.App. at 79, 895 P.2d 423. This argument needlessly injected the sensitive issues of nationality and ethnicity into a case where the defendant and his associates were alleged members of a Central American gang, many of whom, including Soto-Rodriguez, required Spanish language interpreters during the trial.
¶ 37 Elsewhere in the closing argument, the prosecutor called further unnecessary attention to the defendant's ethnicity. He stated, "[W]hen the gang members were at [Soto-Rodriguez's] house after receiving the call they walked out of the house with their chests sticking out proudly showing their machismo." This statement clearly was designed to call attention to the defendant's ethnicity. The statement is troubling on its own. In the context of the argument as a whole, it added to the potential for a verdict based on ethnic prejudice or nationalistic concerns. It is unquestionably improper for a prosecutor to reference racial or ethnic prejudice or to appeal to jurors' fear and repudiation of criminal groups as a reason to convict. Belgarde, 110 Wash.2d at 507, 755 P.2d 174.
¶ 38 There is a clear danger that the prejudicial impact of the prosecutor's objectionable statements, considered in their totality, affected the jury's verdict.

B. Issues in the case
¶ 39 The issues in the case magnified the prejudicial impact of the misconduct. The primary issue in the case was Soto-Rodriguez's role, if any, in the homicide. There was evidence admitted from which the jury could have reasonably entertained doubts about Soto-Rodriguez's guilt. First, eyewitnesses to the shooting provided varying accounts of the number of people involved in the fight that led up to the shooting. Two of the fight's participants, Viellmas and DeJesus, described the fight as being "two against two," and identified Perez-Mejia and Dominguez as their co-combatants. DeJesus also testified that he saw Soto-Rodriguez *845 entering the nightclub earlier with two women, and did not believe Soto-Rodriguez was involved in the fight or the shooting. Second, there was testimony that Andrade-Soriano, Jensen, and Devitt, witnesses who provided damaging testimony against Soto-Rodriguez, had provided conflicting accounts of the events surrounding the shooting on different occasions, potentially undermining the jury's confidence in their testimony. Additionally, witnesses Jessica Rodriguez, Clift, Katia and Brenda Lugo Olivas, Villegas-Trejo, and Soto-Rodriguez offered accounts of the events surrounding the shooting that tended to exculpate Soto-Rodriguez. Because the State's case against Soto-Rodriguez was controverted, the prejudicial impact of the misconduct is magnified.
¶ 40 Moreover, although gang-related evidence was central to the State's theory of culpability, this evidence was, by its nature, highly prejudicial. The trial court carefully circumscribed the admissibility of this prejudicial evidence and based its evidentiary rulings on proper considerations of the State's need to present probative evidence balanced against Soto-Rodriguez's right to a trial free from unfair prejudice. Unfortunately, the prosecutor's closing argument put before the jurors several of the most problematic types of prejudice that the law essays to exclude from juror consideration, including nationality, ethnicity, patriotism, and fear of crime, and invited a verdict based on passion or prejudice, rather than on proper evidence. This misconduct upset the balance struck by the trial court's principled evidentiary rulings. Accordingly, in view of the issues in the case, the misconduct likely affected the jury's verdict.

C. Instructions given by the trial court
¶ 41 The trial court gave no curative instruction following Soto-Rodriguez's objection. Instead, it overruled the objection.
¶ 42 The trial court, at best, failed to cure the prejudicial impact of the improper argument. At worst, the trial court augmented the argument's prejudicial impact by lending its imprimatur to the remarks. See State v. Davenport, 100 Wash.2d 757, 764, 675 P.2d 1213 (1984) (court's ruling lent aura of legitimacy to prosecutor's misconduct). This increases the likelihood that the misconduct affected the jury's verdict.

D. Evidence addressed in argument
¶ 43 The evidence addressed in the argument also highlights the prejudicial impact of the misconduct.
¶ 44 Although much of the prosecutor's closing argument was properly based on the evidence, the case against Soto-Rodriguez was comprised of prejudicial, yet properly admissible, evidence of a gang dispute that resulted in the death of an innocent. The misconduct at issue encouraged the jury to base its verdict on the powerful emotions, concerns or prejudices that arise from the facts of the case, rather than on the facts themselves.
¶ 45 The evidence addressed by the improper argument increases the likelihood that it affected the jury's verdict.
¶ 46 We conclude that the argument was improper. We also conclude that there exists a substantial likelihood that the prosecutor's remarks affected the jury's verdict and, thus, Soto-Rodriguez has established the prejudicial impact of the improper argument. We also conclude that this error was of constitutional magnitude and that it was not harmless.[11]
¶ 47 Soto-Rodriguez did not receive a fair trial. Accordingly, we must reverse Soto-Rodriguez's conviction and remand the matter for a new trial.
¶ 48 The remainder of this opinion has no precedential value. Therefore it will be filed for public record in accordance with the rules governing unpublished opinions.
We concur: APPELWICK, C.J., and BAKER, J.
NOTES
[1] In the unpublished portion of this opinion, we also conclude that sufficient evidence on each element of the charged offense was introduced at trial in support of the jury's verdict. Thus, Soto-Rodriguez is not entitled to the remedy of dismissal of the charge against him.

In addition, we determine that the trial court properly ruled that Soto-Rodriguez's statement to police officers was voluntarily made and that testimony concerning his remarks was properly admitted at trial.
Several other alleged trial irregularities do not merit appellate relief. We address these issues to note our evaluation of the claims, although we have no reason to anticipate similar difficulties upon remand.
[2] Other testimony was that "VL" stood for "Varrios Locos."
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The previous incident between the 18th Street gang and the MS was an assault involving a pool cue that occurred on April 27, 2003.
[5] Aguilar-Segovia was unable to discern who in the car responded to Soto-Rodriguez's question.
[6] Jessica Rodriguez is not related to Soto-Rodriguez.
[7] This principle is one of long standing. Almost three decades ago, our Supreme Court explained: "In presenting a criminal case to the jury, it is incumbent upon a public prosecutor, as a quasi-judicial officer, to seek a verdict free of prejudice and based upon reason. As we have stated on numerous occasions, the prosecutor, in the interest of justice, must act impartially, and his trial behavior must be worthy of the position he holds. Prosecutorial misconduct may deprive the defendant of a fair trial. And only a fair trial is a constitutional trial." State v. Charlton, 90 Wash.2d 657, 664-65, 585 P.2d 142 (1978).
[8] Federal courts addressing these issues have likewise held that it is improper for a prosecutor to urge the jury "to view this case as a battle in the war against drugs, and the defendants as enemy soldiers," Arrieta-Agressot v. United States, 3 F.3d 525, 527 (1st Cir.1993), that the constitution prohibits appeals to racial, ethnic or religious prejudice, United States v. Cabrera, 222 F.3d 590, 594 (9th Cir.2000), and that it is improper for a prosecutor to "direct the jurors' desires to end a social problem toward convicting a particular defendant." United States v. Solivan, 937 F.2d 1146, 1153 (6th Cir.1991) (reversing based on prosecutor's call to send a message to drug dealers, notwithstanding curative instruction given by trial court).
[9] Failure to object to an improper argument constitutes a waiver of the claimed error unless the improper argument was so flagrant and ill-intentioned that it caused an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. Hoffman, 116 Wash.2d at 93, 804 P.2d 577. Because Soto-Rodriguez's counsel properly objected to the inappropriate argument, this greater standard of prejudice does not apply to his claim of error on appeal.
[10] Testimony at trial had described Soto-Rodriguez as having the nickname "Scorpion."
[11] Before we hold a constitutional error to be harmless, we must find it harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Charlton, 90 Wash.2d at 664, 585 P.2d 142.