# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52494-5-II |
| Respondent, | |
| v. | |
| MANUEL R. BARNARD, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Manuel Barnard appeals his conviction for custodial assault. He argues that the prosecutor committed misconduct by appealing to the jury's passion and prejudice. We agree and reverse.[1]

## FACTS

The Thurston County Jail housed Barnard in an administrative segregation unit. Inmates in the administrative segregation unit are allowed out of their cells, one at a time, for one hour per day to use a kiosk to make phone calls or video chat.

On the day of the charged assault, Barnard's one hour concluded and on multiple occasions two corrections deputies directed Barnard to return to his cell. Barnard became upset and replied to both correctional deputies with what could be considered as vulgar language. Eventually, Barnard stood in the doorjamb of his cell, but he would not enter it.

---

[1] Barnard makes other arguments; however, because we reverse on prosecutorial misconduct, we need not address them.

Deputy Joseph Gerkman placed his hand on Barnard's chest, and "tried to guide him" into his cell. 1 Report of Proceedings (RP) at 170. Barnard responded with a "push against [the deputy's] person." RP at 171. After a struggle where Gerkman used his fists and knees to strike Barnard several times, five correctional deputies gained control of Barnard and returned him to his cell. Gerkman sustained a scratch on his neck. The State charged Barnard with custodial assault.

I.      TRIAL TESTIMONY

Three correctional deputies testified at trial. The State elicited testimony from each of the deputies about the type and nature of the unit in which Barnard was housed.

Deputy Seth Jensen testified:

Q. What is that pod used for generally for the jail?
A. Lockdown, disciplinary, administration segregation.
Q. Are the inmates that are in that area, or assigned to that area, do they usually receive some classification because of their behavior in the jail that they would be sent to that administrative segregation?
A. Yes.
. . . .
Q. Had you encountered [Barnard] previous to January 30th, 2018?
A. Yes.
Q. Had he been in the administrative segregation unit before January 30th, 2018?
A. Yes.

RP at 80-84.

Deputy Terri Coty testified:

Q. Do some officers carry tasers?
A. Yeah, depending on what unit you work in.
Q. And why would that be dependent, if you could explain that?
A. Well, our max inmates that are dangerous possibly, you would carry tasers in that department. That would be C unit, our max unit. . . .
Q. And in this instance when you responded on January 30th, what dorm were you responding to regarding an assault incident?
A. I was responding to C unit.
Q. And what is that unit considered? Is that a max unit?
A. It is.

Q. Is it also considered administrative segregation?
A. Yes.

RP at 138-139.

Deputy Gerkman testified:

A. . . . At that time, I was scheduled to work Charlie unit, which is . . . our maximum housing unit.
Q. Is that where Inmate Manuel Barnard was situated—or where he was being held on January 30th, 2018?
A. Yes, sir.
Q. Had you had dealings with Inmate Barnard prior to January 30th, 2018?
A. Yes, sir.
Q. Had he been in that unit before January 30th, 2018?
A. Yes, sir.

RP at 157.

Deputy Gerkman further testified:

Q. Is that a problem if an inmate doesn't go back to their cell for the next person to come out?
A. Yes.
Q. Why is that a problem?
A. It creates a problem because, like I said previously, the people, since everything is scheduled in there, they set up all their things they're going to do on their time out. So the next guy could have a video visitation set up right at two in the morning, he's like, "Hey, I need to come out, I need to talk to my people."
And they pay for these visits. Sometimes, it's hard for them to set them up, so it's only fair they get that for the time. And, additionally, it can hold us from being able to do welfare checks on other units, including the person who has a close observation, which is a high priority for us.
Q. Could you just let the other inmate out while Mr. Barnard is outside of his cell?
A. No, absolutely not.
Q. Why couldn't you do that?
A. Because of the people housed within that unit and their known behavioral problems. We are not allowed to do that because it can create potential conflicts. These are individuals that have potentially shown that they do not cohabitate well, so we need to make sure we're preventing altercations for the safety of everyone.

RP at 162-63.

3

Barnard pled self-defense. During cross-examination of Gerkman, Barnard engaged in the following line of questioning.

> Q. . . .[A]t this point, you were no longer using any kind of de-escalation techniques' would you agree with that?
> A. No. At that point, the situation had escalated.
> Q. After you pushed him?
> A. After I tried to guide him into his cell and he subsequently pushed me.
> Q. Okay. It looks to me like every action Mr. Barnard was taking at that moment was in response to something you were doing. Is that the correct order of events? You push him, he puts his hands down; is that correct? That's how it happened?
> A. I tried to guide him in, and he pushed out, yes.
> Q. Do you want to watch it again? You pushed him, and then he responded, right?
> A. He responded to my action of trying to guide him in, yes.
> Q. I want to make sure I understand. Every physical action that Mr. Barnard appears to take on this video was in response to something you were doing; is that correct?
> A. Just as mine were to his, yes.
> Q. Okay. So, yes?
> A. Yes. I was reactionary to his actions.
> Q. You pushed him first, right?

RP at 226-27.

Barnard did not object to any of the testimony.

II.    JURY INSTRUCTIONS

The court instructed the jury on self-defense. It also defined assault as "an intentional touching or striking of another person that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive." CP at 114 (Instr. 7). The court instructed the jury that the lawyer's remarks were intended to help the jurors understand the evidence and apply the law, but that they were not evidence.

In addition, the instructions stated:

> As jurors, you are officers of this court. You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference. To assure that all parties receive a fair trial, you must act impartially with an earnest desire to reach a proper verdict.

CP at 110 (Instr. 1).

III.     THE STATE'S CLOSING ARGUMENTS

The following excerpts are from the prosecutor's closing argument and rebuttal closing argument.

> Now, Inmate Barnard did not do that. He's been told twice, 'Go back to your cell,' and he doesn't do it. Corrections Deputy Gerkman now comes down the stairs from the top tier, and he also tells Mr.—or Inmate Barnard to go back to his cell.
>
> Now, this is when Inmate Barnard starts his aggressive and kind of demeaning language towards the officers. He started calling them names. Certainly, corrections deputies are used to that. *You know, inmates are going to act immaturely, and they're going to make poor decisions. That's why they're inmates.* But he was given a lawful order to go back to his cell on at least three occasions at this point. So Deputy Jensen has told him twice, and Deputy Gerkman has told him once. But he continues to ignore them.

RP at 273 (emphasis added).

> Well, he's not complying. They've tried to talk him into doing it. They've tried to encourage him to do it. And Deputy Gerkman gave that great example of ask, tell – I think he said "ATM," ask, tell, and then you take it on the next level. I'm sorry, I forget what "M" stood for. But you saw the example of that. And in this case, Inmate Barnard still did not want to comply.
>
> Now, remember, he's in administrative segregation. *He's in the jail because he can't follow society's rules. He's in administrative segregation because he can't follow the jail's rules.* And at some point, the officer has to move him into his cell, and that is the point in which Deputy Gerkman places his left hand on Mr. Barnard's chest and tries to, he says, guide back. And you watch the video several times, he does not shove him, but, certainly, he's trying to move him back with his hand, his left hand.

RP 275-76 (emphasis added).

5

> That's what [the defense is] saying. Well, Deputy Gerkman caused Mr. Barnard to act this way. That's not what the evidence showed you. As a matter of fact, the evidence has shown you the accused's actions. He would not return to his cell. He returns to his cell, no issue, end of situation, right? But does he do that? No. He was irritated, agitated, and aggressive. *I've said this before and I'll say it again. He's in jail for a reason. He can't follow the rules of society. That's why jails exist. Because people cannot follow the rules of society. We have laws, and you're bound to follow those laws as a citizen, and Mr. Barnard cannot. He cannot even follow the rules in the jail, because again, that's not Mr. Barnard.* He doesn't want to follow the rules. And in this instance, what do we have? He does not want to follow the rules again. The officers are telling him, "Go to your cell."

RP at 306-07 (emphasis added).

During closing arguments, the prosecutor used a PowerPoint presentation. It contained still frames from the surveillance video of the altercation. The PowerPoint included a slide that included the excerpt from instruction 1 quoted above.

Another slide, titled "Focus on the Actions of the Accused," stated, "[w]ho *is in the jail because they cannot follow the rules of society*," and "[w]ho *is in administrative segregation because they cannot follow the rules of the jail*." CP 98 (emphasis added). The statements were in the middle of the slide among 10 other statements like "[w]ho would not follow lawful orders to return to their cell," and "[w]ho was challenging the directives given." CP at 98. Barnard did not object to any statements or the use of slides in closing argument.

The jury found Barnard guilty. Barnard appeals.

ANALYSIS

I.    PROSECUTORIAL MISCONDUCT

Barnard argues that the prosecutor committed misconduct by undermining the presumption of innocence and appealing to the jury's passion and prejudice. He argues that the prosecutor pursued a theory that he was more likely guilty of custodial assault because he had demonstrated

his inability to "follow the rules" by being in the segregation unit of the jail. He also argues that the prosecutor emphasized this argument by referring to him as "Inmate Barnard" throughout trial.

The State argues that the prosecutor's statements were not improper because when the prosecutor's arguments are taken as a whole, the allegedly improper statements were not made to support a theory that Barnard was guilty of assault because he was in administrative segregation. The State also contends that even if the statements were improper, they were not flagrant and ill intentioned, and did not cause prejudice. We agree with Barnard.

### A.    Legal Principles

"A prosecutor serves two important functions. A prosecutor must enforce the law by prosecuting those who have violated the peace and dignity of the state by breaking the law. A prosecutor also functions as the representative of the people in a quasijudicial capacity in a search for justice.
Defendants are among the people the prosecutor represents. The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated. Thus, a prosecutor must function within boundaries while zealously seeking justice."

*State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) (internal citations omitted).

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). An appellant claiming prosecutorial misconduct must demonstrate that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

When a defendant fails to object to the improper comments at trial, the defendant must also show that the comments were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. In addition, the defendant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d

7

at 761. The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remarks. *Emery*, 174 Wn.2d at 762.

"Although a prosecutor has wide latitude to argue reasonable inferences from the evidence, a prosecutor must 'seek convictions based only on probative evidence and sound reason.'" *Glasmann*, 175 Wn.2d at 704 (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)) (internal citation omitted). "It is unquestionably improper for a prosecutor to . . . appeal to jurors' fear and repudiation of criminal groups as a reason to convict." *State v. Perez-Mejia*, 134 Wn. App. 907, 918, 143 P.3d 838 (2006).

A prosecutor's closing statement is improper if it is a mere appeal to the passion and prejudice of a jury or a prejudicial allusion to matters not included in the evidence. *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988). "Washington cases are in agreement . . . that unfair prejudice is caused by evidence likely to arouse an emotional response rather than a rational decision among the jurors." *Carson v. Fine*, 123 Wn.2d 206, 223, 867 P.2d 610 (1994). Highly prejudicial images may sway a jury in ways that words cannot and may be very difficult to overcome with an instruction. *Glassman*, 175 Wn.2d at 707. "Prejudicial imagery may become all the more problematic when displayed in the closing arguments of a trial, when the jury members may be particularly aware of, and susceptible to, the arguments being presented." *Glasmann*, 175 Wn.2d at 707-08.

Washington courts have generally concluded that referring to a defendant as something other than his or her proper name may not be improper when supported by evidence. *See State v. McKenzie*, 157 Wn.2d 44, 57-58, 134 P.3d 221 (2006) (not misconduct to refer to defendant as "rapist"); *State v. Hunter*, 35 Wn. App. 708, 715, 669 P.2d 489 (1983) (not misconduct to refer to

defendant as "pimp"); *State v. Buttry*, 199 Wash. 228, 248, 250, 90 P.2d 1026 (1939) (prosecutor's reference to murder defendant as "vicious" and "a killer" was not improper).

"'[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'" *Glasmann*, 175 Wn.2d at 707 (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011)).

B.    Improper Statements

The prosecutor made many statements during closing argument that were neither based on the evidence nor reasonable inferences from the evidence.

The prosecutor repeatedly stated that Barnard was generally incapable of following the rules of society or the jail. The evidence did not support these statements. The prosecutor used them to explain why Gerkman used physical force to return Barnard to his cell and to rebut Barnard's self-defense argument. The evidence did not reveal why Barnard was in administrative segregation. The record also did not contain any other evidence of Barnard's conduct while in jail. There are any number of plausible explanations as to why a person is in administrative segregation, yet the prosecutor made general arguments that were not supported by the evidence.

The prosecutor argued that Barnard's use of vulgar language towards the deputies during the incident demonstrated his immaturity and his poor decision making skills. Barnard's use of vulgar language is not evidence that supports the prosecutor's comments. There are many plausible reasons that people use what people consider vulgar language, including environmental influences and upbringing. It is not a reasonable inference from the evidence that there is a nexus between the use of vulgar language and immaturity or poor decision making.

The evidence does not support the prosecutor's statement that Barnard was in jail because he could not follow society's rules. The record does not reveal either why Barnard was in jail or why he was in administrative segregation.

These statements, and others, appeal to the passion and prejudice of the jury. They suggest to the jury that Barnard was guilty of custodial assault because he was an inmate, because inmates are dangerous and immature, and because they cannot follow the rules of society.

In addition, on approximately 120 occasions during the trial, and in front of the jury, the prosecutor referred to Barnard as "Inmate Barnard."[2] Barnard did not argue the State had not proved he was in custody. Rather, he argued self-defense. The use of the term "Inmate Barnard," when coupled with the other statements by the prosecutor, clearly appealed to the passion and prejudice of the jury.[3]

Repeated use of "inmate" to refer to Barnard together with statements about Barnard's inability to follow the rules, formed an argument that "appeal[ed] to jurors' fear and repudiation of criminal groups," and referenced prejudicial allusions outside of the evidence. *Perez-Mejia*, 134 Wn. App. at 918; *Belgarde*, 110 Wn.2d at 507. The prosecutor's statements were flagrant and ill intentioned.

---

[2] The prosecutor also referred to the defendant as "Mr. Barnard" an almost equal number of times.

[3] As noted above, referring to a defendant as "rapist," "pimp," "vicious," or "a killer" may not be improper when supported by evidence. *McKenzie*, 157 Wn.2d at 57; *Hunter*, 35 Wn. App. at 715; *Buttry*, 199 Wash. at 248, 250. However, in each of these cases, the prosecutor made the reference one time in front of the jury.

C.      Prejudicial Effect

Barnard argues that the prosecutor's improper arguments told the jury that Barnard's status as an inmate in the segregation unit demonstrated evidence of his guilt. He submits the statements constituted prejudice because overwhelming evidence against him did not exist. Because Barnard never lifted his fists to the deputy, the jury could have reasonably concluded that even if he had failed to obey an order, he did not assault the deputy and that he acted in self-defense.

The State argues that there is no likelihood that the statements affected the verdict because everyone was aware that Barnard was in custody, and the assault was recorded on video. We agree with Barnard.

Because the defense did not object to the statements, Barnard must show that the improper conduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. The prosecutor made improper statements about Barnard being a rule breaker throughout closing argument: "[H]e's in administrative segregation. He's in the jail because he can't follow society's rules. He's in administrative segregation because he can't follow the jail's rules." RP at 276. He reiterated at the end of his closing: "He's in jail for a reason. He can't follow the rules of society. That's why jails exists. Because people cannot follow the rules of society. We have laws, and you're bound to follow those laws as a citizen, and Mr. Barnard cannot. He cannot even follow the rules in the jail, because again, that's not Mr. Barnard. He doesn't want to follow the rules." RP at 306.

These statements along with the constant reminder of Barnard's status as an inmate, makes the conduct so pervasive that the cumulative effect of the statements was so flagrant that no instruction or series of instructions could erase their combined prejudicial effect. *Glasmann*, 175

11

Wn.2d at 707. There is a substantial likelihood that the pervasiveness of the prosecutorial misconduct affected the verdict.[4]

We reverse.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Glasgow, J.

---

[4] Although the jury viewed the video of the incident, in light of Bernard's assertion of self- defense, the video did not provide such overwhelming evidence as to eliminate any prejudice from the prosecutor's improper comments.