FILED
COURT OF APPEALS
DIVISION II

2013 APR -2 AM 8:46

STATE OF WASHINGTON
BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON | No. 41347-7-II |
| Respondent/<br>Cross-Appellant, | |
| v. | |
| LARRY EDWARD TARRER, | UNPUBLISHED OPINION |
| Appellant/<br>Cross-Respondent. | |

JOHANSON, A.C.J. — In 2010, a Pierce County jury convicted Larry Edward Tarrer of first degree murder, attempted first degree murder, and first degree manslaughter for a 1991 shooting. Tarrer appeals, claiming (1) various evidentiary errors, (2) prosecutorial misconduct, (3) sentencing errors, and (4) ineffective assistance. We reverse and remand because multiple episodes of prosecutorial misconduct deprived Tarrer of a fair trial. In addition, we address evidentiary issues that may arise on retrial.[1]

FACTS

In January 1991, Claudia McCorvey was six months pregnant and living in a Tillicum apartment. McCorvey's apartment was a known crack house where cocaine addicts and dealers

---

[1] We received supplemental briefing regarding sentencing issues. Because we reverse Tarrer's conviction and sentence, and remand for retrial, we decline to address those issues here. Similarly, we do not reach the State's cross appeal because it, too, is moot once we reverse Tarrer's conviction.

could obtain and smoke cocaine. Tarrer was a 17-year-old small-time cocaine dealer and Bishop Asia Johns[2] was his supplier.

On January 8, Johns was dealing drugs out of McCorvey's apartment, and that evening McCorvey, Johns, Lavern Simpkins, and others smoked cocaine there into the morning. That evening, Rickey Owens had visited McCorvey's apartment to obtain cocaine. On the way back to his car, Owens heard a commotion and turned back toward the apartment and saw a man pull a silver pistol from a car parked outside.

Just before 1:00 AM, Simpkins and McCorvey were the only people still at McCorvey's apartment when someone opened the front door and fired multiple shots into the unit. Two shots killed Simpkins, and two more struck McCorvey, rendering her a paraplegic. Medics transported McCorvey to the hospital where doctors performed an emergency cesarean section and removed her live baby. The baby's condition, however, rapidly deteriorated and soon died.

Authorities recovered .45 caliber shell casings and slugs from the apartment. Authorities also found a Tanqueray gin bottle in the apartment with Tarrer's fingerprints on it.

On January 9, Pierce County Sheriff's Detective Fred Reinicke visited McCorvey at the hospital and showed her a six-picture photo montage of McCorvey's acquaintances. Detective Reinicke showed McCorvey each of the six pictures, one at a time, and McCorvey identified Tarrer as her shooter.

---

[2] Known as "Slim" during that time. Verbatim Report of Proceedings (VRP) (Sept. 29-30, 2010) at 12.

Detective Reinicke returned to the hospital to speak with McCorvey on January 11. He took McCorvey's statement and again showed her the photo montage—she again identified Tarrer as her shooter.

On February 12, Detective Reinicke showed Owens the same photo montage he showed McCorvey. Owens identified Tarrer as the man with the gun outside the apartments on the night of the shooting.

In 1991, Tarrer entered an *Alford/Newton*[3] plea to amended charges of second degree murder and first degree assault.[4] In 2004, while serving his sentence, he successfully filed a CrR 7.8 motion to vacate his conviction. The State then withdrew the May 1991 amended information.

In 2009, the State filed a corrected information charging Tarrer with premeditated first degree murder, attempted first degree murder, and first degree manslaughter. It also added three sentencing aggravators to the attempted first degree murder charge.

Before the 2009 trial, Tarrer moved to dismiss the case or to suppress McCorvey's identification of Tarrer in the photo montage because the State provided Tarrer just three of the six photos used in the January 9, 1991 photo montage with McCorvey, and just four of the six photos used in the January 11, 1991 montage. He also filed a motion to suppress Tarrer's

---

[3] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed 2d 162 (1970); *State v. Newton*, 87 Wn.2d 363, 552 P.2d 682 (1976).

[4] Tarrer then unsuccessfully moved to withdraw his plea. He appealed the denial of his motion to withdraw his plea, and we affirmed. *State v. Tarrer*, 140 Wn. App. 166, 165 P.3d 35 (2007). Tarrer also appealed the trial court's order vacating his conviction under CrR 7.8 because he sought specific performance of the original plea agreement. We dismissed the appeal because Tarrer was not aggrieved—he prevailed in vacating his convictions.

identification by McCorvey and Owens because Detective Reinicke used unreliable photo montage procedures. The trial court denied these motions.

The case went to trial in September and October 2009. During trial, Tarrer moved to admit McCorvey's medical records from her treatment at Harborview Medical Center in order to show which of McCorvey's bullet wounds were entrance or exit points. The trial court denied this motion because the records constituted inadmissible hearsay. This trial resulted in a mistrial.

The State retried the case in September and October 2010. After jury selection, but before the trial began, local news outlets carried stories about how Tarrer—a Muslim—and another inmate had sued the Pierce County Jail and the Pierce County Sheriff's Department for religious discrimination.[5] Although two jurors admitted seeing the story, the trial court declined to dismiss them.

At trial, witnesses offered varying accounts of what they could recall from the 1991 incident. The State called Johns, Owens, and McCorvey to offer their accounts. A neighbor, Monte Moore, and Tarrer testified in Tarrer's defense.

Johns testified that he went to McCorvey's apartment on January 8, 1991, to smoke cocaine. The apartment was full of people partying and smoking cocaine. Tarrer arrived after Johns, and while Johns, McCorvey, and Simpkins sat in the back bedroom smoking cocaine, Tarrer walked into the back bedroom to speak with McCorvey. Tarrer and McCorvey retreated

---

[5] The front page news article in the Tacoma News Tribune, pictured "TARRER" and a headline, "Jail limits religion, lawsuit suggests." Clerk's Papers (CP) at 550. The lead paragraph read, "Two followers of Islam are suing Pierce County, claiming Muslims are prohibited from practicing their religion appropriately while incarcerated in the county jail." CP at 550.

4

to the bathroom to speak privately, and Johns learned from McCorvey that Tarrer mentioned some missing cocaine. Later, Johns left the apartment, and McCorvey, Simpkins, Tarrer, and another remained. As Johns walked from McCorvey's apartment, he heard gunfire coming from inside, though he did not witness the shooting.

Owens testified that at the time of the shooting, he was also a cocaine addict. He had heard that he could acquire drugs from Tarrer at McCorvey's apartment, so he went to McCorvey's around 8:00 to 9:00 PM. Owens claimed that he traded Tarrer a bottle of Tanqueray gin for a $20 cocaine rock and immediately left. As he left, though, he witnessed Tarrer become accusatory, claiming someone stole his drugs. Though he saw Tarrer retrieve a silver, semi-automatic pistol from a green and white two-door Cutlass, he, did not witness the shooting.

McCorvey explained that she was in her bedroom that evening smoking cocaine. She stated that Tarrer never came into the bedroom to speak with her about missing drugs, though eventually Tarrer became "loud and rude and obnoxious" and Johns ordered him to leave. Verbatim Report of Proceedings (VRP) (Oct. 4, 2010) at 23. She believed that Tarrer was drunk and upset because he lost his drug "canister." VRP (Oct. 4, 2010) at 24. Tarrer left, as did others, and, soon only McCorvey and Simpkins remained. Later, when McCorvey went into her front room, the front door opened, and the shooter stepped inside and fired multiple shots in the apartment. McCorvey recognized Tarrer as the shooter.

Moore lived across from McCorvey in an adjacent apartment. He testified that on the night of the shooting, he heard a commotion from McCorvey's apartment and a male voice yelling, then three gunshots. He looked out his window and saw four men walk out of McCorvey's apartment; the last man out stepped back into the apartment, and with his right

5

hand, pulled a gun from his left side and fired two more shots. The four men then departed in a darker, four-door sedan. Moore described the shooter as black, between 6 feet and 6 feet 2 inches tall.

Tarrer testified that in January 1991, he was left handed, 5 feet 7 inches, 150 pounds, and drove a black 1983 two-door Cutlass. He also asserted that he had never exchanged drugs for alcohol or anything except money. He had twice been to McCorvey's apartment to buy drugs from Johns—once in 1990 and again "closely after New Year's of 1991." VRP (Oct. 7, 2010) at 31. At the 1991 visit, Johns answered the door but instructed Tarrer to join him in Johns's car to do the deal. The two went to Johns's car where Johns had Tarrer hold the bottle from which Johns had been drinking while Johns located Tarrer's drugs. Tarrer explained that he did not know or shoot McCorvey or Simpkins.

During closing argument, the State asked the jury to declare the truth. It argued that a "criminal trial is supposed to be a search for the truth." VRP (Oct. 11, 2010) at 8. Slides accompanied the State's closing argument. The State also explained the reasonable doubt standard to the jury using a fill-in-the-blank argument. Tarrer unsuccessfully objected to this argument as burden shifting and asked for a curative instruction.

The State further articulated the reasonable doubt standard by equating it to every day scenarios. It also analogized the jury's responsibility to putting together a puzzle.

Finally, the State compared questions of reasonable doubt to the September 11, 2001 terrorist attacks and invoked the jury's patriotism. The jury convicted Tarrer on all counts and answered "yes" to the aggravators.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT

Tarrer argues that the State committed misconduct during closing and rebuttal arguments when it (1) tasked the jury with declaring the truth through its verdict, (2) used a fill-in-the-blank argument, (3) equated the reasonable doubt standard to everyday decisions, and (4) argued the reasonable doubt standard in the context of the 9/11 terrorist attacks. The State did commit misconduct, depriving Tarrer of a fair trial. Therefore, we reverse Tarrer's conviction and remand for retrial.

A. Standard of Review and Rules of Law

The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 3 and article I, section 22 of the Washington Constitution. *State v. Finch*, 137 Wn.2d 792, 843, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999). Prosecutorial misconduct may deprive a defendant of her or his constitutional right to a fair trial. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). A fair trial requires that the State's attorney not throw the prestige of her public office and the expression of her own belief of guilt into the scales against the accused. *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011). The State may not use arguments calculated to inflame the jury's passions or prejudices. *State v. Brett*, 126 Wn.2d 136, 179, 892 P.2d 29 (1995), *cert. denied*, 516 U.S. 1121 (1996).

To prevail on a prosecutorial misconduct claim, a defendant must show that in the context of the record and all the trial circumstances, the State's conduct was improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To show prejudice, a

defendant must show a substantial likelihood that the misconduct affected the jury verdict. *Thorgerson*, 172 Wn.2d at 442-43. If a defendant fails to object to misconduct at trial, she fails to preserve the issue unless she establishes that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice. *Thorgerson*, 172 Wn.2d at 443.

The cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction can erase their combined prejudicial effect. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d 673 (2012) (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011), *adhered to on remand*, noted at ___ Wn. App. ____, 2013 WL 703974, at * 1). We focus less on whether the State's misconduct was flagrant and ill intentioned and more on whether the resulting prejudice could have been cured. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). But highly prejudicial imagery may be very difficult to overcome with instruction. *Glasmann*, 175 Wn.2d at 707. And prejudicial imagery may become all the more problematic when displayed in a trial's closing arguments, when the jury is particularly aware of, and susceptible to, the arguments being presented. *Glasmann*, 175 Wn.2d at 707-08.

In determining whether misconduct requires reversal, we do not decide if sufficient evidence justifies upholding the jury verdicts. *Glasmann*, 175 Wn.2d at 711. Rather, we decide whether there is a substantial likelihood that the misconduct affected the jury's verdict. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

### B. Analysis

#### 1. Declare the Truth Arguments

Tarrer first argues that the State improperly tasked the jury with declaring the truth through its verdict. Tarrer is correct that "truth" arguments are improper.

A jury's job is not to determine the truth; a jury therefore does not "'speak the truth'" or "'declare the truth.'" *Emery*, 174 Wn.2d at 760 (quoting *State v. Anderson*, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010)). Rather, a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt. *Emery*, 174 Wn.2d at 760. Ultimately, "truth" statements are improper. *Emery*, 174 Wn.2d at 760.

Here, the State began its closing argument by telling jurors, "A criminal trial is supposed to be a search for the truth." VRP (Oct. 11, 2010) at 8. It also projected a slide image that described the trial as "A SEARCH FOR THE TRUTH." Clerk's Papers (CP) at 661. The State argued, "[B]y your verdict in this case, you will be declaring the truth as to the charges in this case. And you will declare the truth about whether Larry Tarrer committed [murder], attempted [murder] and manslaughter." VRP (Oct. 11, 2010) at 11. Another slide read, "VERDICT" and below it read "VEREDICTUM" and "TO DECLARE THE TRUTH." CP at 662.

The State also argued, over Tarrer's unsuccessful objection, "On behalf of the State of Washington and all the law abiding citizens in it[,] I would ask you to render a true verdict in this case."[6] VRP (Oct. 11, 2010) at 54. It then added, "I am asking you to render a true verdict in

---

[6] The State argues that jurors take an oath to render a true verdict. While a state statute requires jurors to render a true verdict in civil proceedings, *see* RCW 4.44.260, it requires no such oath in criminal matters. *See also* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.01, at 4 (3d ed. 2008) (asking jurors to affirm that they will "**fairly try the issues in this case according to the evidence and the instructions from the court.**").

this case, the verdict that represents the truth of the charges based on the evidence that you were presented at this trial and the law that applies." VRP (Oct. 11, 2010) at 54-55. Slides advised the jury to declare the truth. One read, "BY YOUR VERDICT, YOU WILL DECLARE THE TRUTH AS TO THE CHARGES IN THIS CASE. YOU WILL DECLARE THE TRUTH ABOUT WHETHER LARRY TARRER COMMITTED MURDER, [ATTEMPTED] MURDER, AND MANSLAUGHTER." CP at 662.

These "truth" references in the State's argument were improper, as the jury's duty is not to declare, search for, or find the truth. Instead, the jury's role is to determine whether the State proved its charges beyond a reasonable doubt. *See Emery*, 174 Wn.2d at 760. Accordingly, the State committed misconduct in repeatedly using these "truth" arguments, and it exacerbated its misconduct by projecting those arguments on slide images. *See Glasmann*, 175 Wn.2d at 707.

### 2. Fill-in-the-Blank Arguments

Tarrer next argues that the State committed misconduct by using the so-called fill-in-the-blank argument to shift the burden to Tarrer. Tarrer is again correct because fill-in-the-blank arguments improperly shift the burden of proof to the defendant.

The State bears the burden of proving its case beyond a reasonable doubt, and the defendant bears no burden. *State v. Camara*, 113 Wn.2d 631, 638, 781 P.2d 483 (1989). By suggesting otherwise, a fill-in-the-blank argument subtly shifts the burden to the defense. *See State v. Gregory*, 158 Wn.2d 759, 859–60, 147 P.3d 1201 (2006) (holding burden shifting to be misconduct).

Our courts have consistently held that fill-in-the-blank arguments improperly shift the burden of proof from the State to the defendant. *See Walker*, 164 Wn. App. at 731-32 (stating on

a slide, "If you were to find the defendant not guilty, you have to say: 'I had a reasonable doubt' . . . . My reason was _____."); *State v. Johnson*, 158 Wn. App. 677, 682, 243 P.3d 936 (2010) ("To be able to find reason to doubt, you have to fill in the blank, that's your job."), *review denied*, 171 Wn.2d 1013 (2011); *State v. Venegas*, 155 Wn. App. 507, 523, 228 P.3d 813 ("In order to find the defendant not guilty, you have to say to yourselves: 'I doubt the defendant is guilty, and my reason is'—blank."), *review denied*, 170 Wn.2d 1003 (2010); *Anderson*, 153 Wn. App. at 431 ("[I]n order to find the defendant not guilty, you have to say 'I don't believe the defendant is guilty because,' and then you have to fill in the blank.").

The State offered a similar argument here, when it explained reasonable doubt,

> [Reasonable doubt] means at the end of this trial, if you were to find the defendant not guilty and the judge releases you from your restriction about talking about this case and you go home and your family and friends say, hey, is that trial finally over and you say, yes, it is. What did you do[?] We found the defendant not guilty. You did? How come? Well, we had a reasonable doubt or I had a reasonable doubt and then the person says to you, ['W]hat was it[?] You have to answer that question.

VRP (Oct. 11, 2010) at 43-44. Tarrer unsuccessfully objected to this argument as burden shifting and asked for a curative instruction. The State added, "[I]f you were to find the defendant not guilty and folks asked you why, you would have to explain it to them. That's what it means: A doubt for which a reason exists." VRP (Oct. 11, 2010) at 48. Accompanying slides explained: "WHAT IT SAYS[.] A doubt for which a reason exists[.] If you were to find the defendant not guilty, *and you were asked why, you have to say* 'I had a reasonable doubt[.]' What was the reason for your doubt? 'My reason was _____." CP at 681.

We have consistently held that the State commits misconduct when it instructs the jury to justify a finding of reasonable doubt with specific explanations. Here, the State explained that a

11

finding of reasonable doubt required a concrete explanation. And on its slide, the State expressly employed a fill-in-the-blank argument using visual imagery. These actions improperly shifted the burden of proof to the defendant. *See Gregory*, 158 Wn.2d at 859-60.

### 3. Reasonable Doubt in Everyday Life

Tarrer next asserts that the State committed misconduct and minimized the burden of proof by comparing the reasonable doubt standard to everyday life decisions and scenarios. Tarrer is correct that comparing reasonable doubt to everyday decision making trivializes and minimizes the reasonable doubt standard.

Tarrer relies on *Anderson* to argue that the State committed misconduct by comparing the burden of proof to everyday decisions and scenarios. In *Anderson*, we held that comments regarding whether to leave a child with a babysitter or change lanes on a freeway were improper "because they minimized the importance of the reasonable doubt standard and of the jury's role in determining whether the State has met its burden." 153 Wn. App. at 431. We continued, "By comparing the certainty required to convict with the certainty people often require when they make everyday decisions—both important decisions and relatively minor ones—the prosecutor trivialized and ultimately failed to convey the gravity of the State's burden and the jury's role in assessing its case against Anderson." *Anderson*, 153 Wn. App. at 431.

Similarly, in *Walker*, the State argued that reasonable doubt is a "common standard that you apply every day" and compared it to choosing to have surgery or leave children with a babysitter. 164 Wn. App. at 732. We held those arguments improper for the same reason.

And in *Johnson*, the State, without objection, used a puzzle analogy in comparing reasonable doubt to assembling evidence to determine beyond a reasonable doubt which city is

pictured in a cityscape. 158 Wn. App. at 682. We held that such an analogy constituted

misconduct because it misstated the reasonable doubt standard. *Johnson*, 158 Wn. App. at 685.

Here, the State equated reasonable doubt to real life scenarios:

When you're at home and you're trying to reach a decision about your family, you are going to not make that decision unless you're convinced beyond a reasonable doubt it's the right decision to make. For example, child care. Each one of us has a different standard at which point we will allow someone else to care for our children, especially when we're talking about, for example, a daycare facility. You will research the daycare facility. How long has it been in business? What's its reputation? Do I know anyone else who is there? Who are the employees? Do I know any of them? Do they let other younger people have contact with the kids? What about the other kids in the daycare? What do we know about them? What do we know about their families?
All of those things are factors you're going to consider and if any one of those things doesn't meet your level of certainty, you're not going to leave your child at that daycare and walk out the door. If you do, you have reached a level of being convinced beyond a reasonable doubt that it's the right decision to make.

VRP (Oct. 11, 2010) at 51. A slide described reasonable doubt: "A COMMON STANDARD

YOU APPLY." CP at 682.

Finally, the State analogized reasonable doubt to putting together a cityscape puzzle.

If you're told that you're supposed to figure out what city this skyline is and then you get part of the picture, so you get some evidence that's presented and it includes a mountain, you're going to think to yourself, maybe it's in . . . west Tacoma. Then you get more evidence and it's a downtown area. Now it's maybe Portland, Seattle or Tacoma. And then you get some more evidence. And that evidence shows you something that is unique to the city of Seattle. Can you find from this picture whether or not this is Seattle or Tacoma? Seattle or Portland? The question is what makes it a determination of whether you can find beyond a reasonable doubt.
This does help to describe the beyond a reasonable doubt standard though, because the last piece of this puzzle is a giant piece of this puzzle, but it comes in as individual pieces of evidence and as it starts to come in each of those additional things is more information than you've been given. This is beyond any doubt. Beyond a shadow of a doubt or beyond all doubt. That's not what's required in a criminal case.

VRP (Oct. 11, 2010) at 98.

Like *Anderson* and *Walker*, here the State compared the reasonable doubt standard to a parent's decision to leave a child with a babysitter only after being satisfied by the babysitter's credentials beyond a reasonable doubt. That argument minimizes and trivializes the jury's role. Accordingly, the argument was improper. *See Anderson*, 153 Wn. App. at 431; *see also Walker*, 164 Wn. App. at 732. And similar to *Johnson*, the State analogized the reasonable doubt standard to assembling a cityscape puzzle. *See Johnson*, 158 Wn. App. at 685. The State committed misconduct in making these arguments.

### 4. Invoking 9/11

Tarrer next argues that the State committed misconduct by invoking the 9/11 terrorist attacks in his reasonable doubt explanation because, he asserts, it unfairly prejudiced Tarrer, a Muslim. Tarrer is correct because this analogy improperly infuses nationalism and religion into this case.

The State has a duty to seek verdicts free from appeals to passion or prejudice. *See State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988). Arguments based on racial, ethnic, and other stereotypes are antithetical to and impermissible in a fair and impartial trial. *Monday*, 171 Wn.2d at 678. Thus, the State engages in misconduct when making an argument that invokes racial, ethnic, or religious prejudice as a reason to convict. *See Belgarde*, 110 Wn.2d at 507 (holding that exploiting defendant's American Indian Movement affiliation to be misconduct). Appeals to prejudice or patriotism are also improper. *State v. Neidigh*, 78 Wn. App. 71, 79, 895 P.2d 423 (1995).

Here, the State compared reasonable doubt to questions involving the September 11, 2001 terrorist attacks and invoked the jury's patriotism.

> September 11, 2001, two airplanes flew into the World Trade Center in New York. I don't know if any of you were there, but I believe probably none of you were there. Do you have any doubt? Do you have a reasonable doubt about whether or not that happened?
>
> If you were talking to someone who was actually there, and you asked them questions like, what tower was hit first? What airline was being flown in each plane? What type of airplane was each one? What floor did you see the plane hit? Which tower went first? How many died in those towers? All of those things are questions that individuals are not going to have the specific answers to. Would you doubt the person if they said two airplanes flew into the World Trade Centers in New York?

VRP (Oct. 11, 2010) at 95-96. Slides accompanied the 9/11 argument, and the State ended with a slide titled "THIS COUNTRY." CP at 687. The State concluded, "[T]his country is the greatest country in the entire world," because "[w]e have rights and freedoms that no other country can possibly compare with." VRP (Oct. 11, 2010) at 101. "In our country what we say is, is that you have the freedom to do anything you want any time you want to anyone you want, but that freedom comes with a price." VRP (Oct. 11, 2010) at 101-02. "Give the defendant the final one of his rights, which is a true and just verdict according to the evidence that was presented and the law that the Court gave you." VRP (Oct. 11, 2010) at 102.

Tarrer is Muslim. The State and *at least* two jury members knew of his faith because they saw the news story detailing Tarrer's religious discrimination lawsuit. Then, in explaining reasonable doubt, the State invoked the deadliest terrorist act to ever occur on American soil— one led by Muslim terrorists that prompted America's entering a prolonged war against extremist Muslim groups. Equally important, the 9/11 attacks initiated a wave of anti-Muslim sentiment. *See, e.g.*, Hilal Elver, RACIALIZING ISLAM BEFORE AND AFTER 9/11: FROM MELTING POT TO

ISLAMOPHOBIA, 21 Transnat'l L. & Contemp. Probs. 119 (2012). Accordingly, the State committed misconduct in analogizing the reasonable doubt standard to questions relating to the 9/11 terrorist attacks because referring to 9/11 appeals to the jury's passion, prejudice, and patriotism and plays on unfair ethnic and religious stereotypes. *See Belgarde*, 110 Wn.2d at 507; *see also Neidigh*, 78 Wn. App. at 79.

The State improperly used truth arguments, fill-in-the-blank arguments, comparisons between reasonable doubt and everyday decision making, and an analogy likening reasonable doubt to 9/11. Tarrer unsuccessfully objected to the State's truth arguments and fill-in-the-blank arguments while other arguments went unchallenged. So to prevail on his prosecutorial misconduct claim regarding the truth statements and fill-in-the-blank arguments, Tarrer must show that in the context of the record and the entire trial, the State's conduct was improper and prejudicial. *See Thorgerson*, 172 Wn.2d at 442. With the everyday decision comparisons and 9/11 analogy, Tarrer must show that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice. *Thorgerson*, 172 Wn.2d at 443.

By the time this case was tried, our courts had already established that truth arguments, fill-in-the-blank arguments, and comparisons between the reasonable doubt standard and everyday decision making constitute misconduct.[7] *See, e.g., Anderson*, 153 Wn. App. at 417 (decided Dec. 8, 2009). We then held in *Walker* that, in cases involving credibility contests between witnesses, improper arguments can easily serve as a deciding factor for the jury. *Walker*, 164 Wn. App. at 738 (citing *Venegas*, 155 Wn. App. 507; *Johnson*, 158 Wn. App. 677).

---

[7] The State claims that its arguments differ from those that our courts have held constitute misconduct. Any technical difference is so minor that the arguments here are still improper.

Such was the case here. Only McCorvey claims to have seen Tarrer shoot, though she had consumed cocaine and may have been impaired. Owens smoked cocaine that day and was the only other person who claimed to see Tarrer with a gun. Two witnesses not under the influence of cocaine, Tarrer and Moore, offered different accounts. The left-handed Tarrer denied being at the apartment during the shooting, and Moore said the shooter was with a group of three other men and fired the gun right handed. So like *Walker*, *Venegas*, and *Johnson*, this case involved a credibility contest.

Assuming, but not deciding that each individual instance of misconduct was insufficient to warrant a reversal, we evaluate the cumulative effect of the repeated truth arguments, fill-in-the blank arguments, everyday life decision-making comparisons, and the 9/11 analogy—and consider the imagery of the slides. Because Tarrer failed to object to some arguments, we apply the heightened test for issue preservation and hold that, cumulatively, the State's arguments and slides were so flagrant and ill intentioned that no instruction could have erased their combined prejudicial effect. Like *Walker*, the conflicting evidence and the frequent use and repetition of improper arguments created a substantial likelihood that the State's improper arguments affected the jury's verdict. Further instruction could not have cured the effect of the State's misconduct. *See Glasmann*, 175 Wn.2d at 707 (noting that highly prejudicial imagery may be difficult to cure); *see also Emery*, 174 Wn.2d at 762 (emphasizing focus on the curability of improper conduct). Therefore, the State's prosecutorial misconduct deprived Tarrer of a fair trial and requires reversal of his convictions.

## II. EVIDENTIARY ISSUES

Tarrer also asserts various evidentiary issues in his Statement of Additional Grounds.[8] He argues that the trial court erred in (1) denying his motion to admit McCorvey's medical records and the trial court's order denying him his right to a complete defense; (2) admitting Owens's and McCorvey's identifications of Tarrer because of unfair photo montage procedures; and (3) denying Tarrer's motion to dismiss when the State failed to preserve the original montage photos and that this failure (4) violated Tarrer's confrontation rights.

We review evidentiary rulings for abuse of discretion. *Finch*, 137 Wn.2d at 810. A trial court abuses its discretion when its actions are manifestly unreasonable or based on untenable grounds or reasons. *Finch*, 137 Wn.2d at 810. We may sustain a trial court's determination to exclude evidence on any proper basis within the record, and we will not reverse simply because the trial court gave a wrong or insufficient reason for its determination. *State v. Markle*, 118 Wn.2d 424, 438, 823 P.2d 1101 (1992).

### A. Admission of Medical Records

Tarrer first argues that the trial court erred in denying his motion to admit McCorvey's medical records and that its order prevented a complete defense. We disagree.

We review a trial court's ruling on a motion to admit business records for a manifest abuse of discretion. *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990). Under the business records hearsay exception, an expert witness may testify only to acts, conditions or events, not to entries in the form of opinions or casual statements. *State v. Wicker*, 66 Wn. App. 409, 413, 832 P.2d 127 (1992).

---

[8] RAP 10.10.

Tarrer moved to admit McCorvey's 1991 medical records. He asserted that he could not locate the physicians who prepared the medical records. He now argues that the medical records would have contradicted McCorvey's testimony that she was facing Tarrer when he shot her. The trial court refused to admit the records because the physicians' assessments regarding the nature of McCorvey's gunshot wounds as either entrance/exit wounds were opinion and not fact, as the physicians were not examining McCorvey to characterize her wounds one way or another. Under the business records exception, witnesses cannot testify to others' opinions. *Wicker*, 66 Wn. App. at 413. And determinations of whether a gunshot wound is an entrance or exit wound are opinions. So the trial court did not abuse its discretion when it denied the admission of the medical records, and we affirm its order. *See Finch*, 137 Wn.2d at 810.

### B. Admission of Eyewitness Identifications

Tarrer next argues that the trial court erred in admitting Owens's and McCorvey's identifications of Tarrer because of unfair photo montage procedures. Again, we disagree.

A trial court performs a two-step test to determine whether an out-of-court identification is impermissibly suggestive. First, the defendant must show that an identification procedure was suggestive. *State v. Kinard*, 109 Wn. App. 428, 433, 36 P.3d 573 (2001), *review denied*, 146 Wn.2d 1022 (2002). If the defendant fails to meet the initial burden, the inquiry ends. *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343, *review denied*, 146 Wn.2d 1022 (2002). Second, the court must determine whether the identification contained sufficient indicia of reliability despite the suggestiveness. *Ramires*, 109 Wn. App. at 761.

Here, the trial court denied Tarrer's motion to suppress Owens's and McCorvey's identification of Tarrer in photo montages. The trial court found that the montage was not

19

impermissibly suggestive, reasoning that the people pictured in the photos "have general similarities, including race, approximate[] age, hair color, and lack of significant identifying marks like scars or tattoos." CP at 323. So, "nothing about the five photographs that are not the defendant that makes the defendant's photograph stand apart from the rest." CP at 323. The trial court also found that Detective Reinicke's procedures during the identification did not cause Tarrer's photo to stand out from the rest.

Here, the trial court did not abuse its discretion. Its reasoning followed the inquiry required to determine if an out-of-court identification is unreasonably suggestive. Accordingly, we affirm the trial court's admission of Owens's and McCorvey's identifications of Tarrer.

### C. Failing to Preserve Montage Images

Tarrer next argues that the trial court erred in denying his motion to dismiss because the State failed to preserve potentially exculpatory evidence, the original montage photos. Tarrer asserts that the failure to preserve evidence deprived him of his due process and opportunity to present an effective defense, as well as confront witnesses against him. We disagree.

Before trial, Tarrer moved to dismiss the case, or in the alternative, to suppress witnesses' eyewitness identification of Tarrer in photo montages because the State failed to preserve some of the photos originally included in the montages. Tarrer alleged that, during discovery, the State provided just three of the six photos used in the montage that Detective Reinicke showed McCorvey on January 9, 1991. Then, the State provided just four of the six photos it showed McCorvey in the photo montage she viewed on January 11, 1991. In his motion, Tarrer argued that the absence of these five photos deprived him of his due process and opportunity to present an effective defense and confront witnesses against him.

## 1. Due Process

If the State fails to preserve potentially useful evidence that is not material and exculpatory, the State has not violated the defendant's right to due process unless the defendant can show that the State acted in bad faith. *State v. Wittenbarger*, 124 Wn.2d 467, 477, 880 P.2d 517 (1994). We review for an abuse of discretion a trial court's order on a motion to dismiss. *State v. Koerber*, 85 Wn. App. 1, 3, 931 P.2d 904 (1996).

The trial court denied Tarrer's motion to dismiss, reasoning that although the original photos were not found during discovery, the State provided Tarrer black and white copies of the photos, which were sufficient. Consequently, the trial court found that the State did not fail to preserve evidence, adding that Tarrer had not demonstrated that the missing photos were exculpatory because the critical photo, Tarrer's, had been preserved.

Here, the trial court did not abuse its discretion because copies of 18-year old original photos could suffice to prepare one's defense in challenging the photo montage identifications; and Tarrer's original photo—the one witnesses used to identify him—still existed at trial. The trial court also reasonably determined that Tarrer did not carry his burden to demonstrate that the missing original photos were exculpatory. *See Wittenbarger*, 124 Wn.2d at 477. Therefore, we affirm the trial court's order denying Tarrer's motion to dismiss.

## 2. Confrontation Rights

Both the United States and Washington Constitutions grant identical confrontation rights. *State v. Florczak*, 76 Wn. App. 55, 71, 882 P.2d 199 (1994), *review denied*, 126 Wn.2d 1010 (1995).

Tarrer argues that the missing original photo montage images deprived him of his right to adequately confront McCorvey on the stand and question her about her identification of Tarrer. The trial court did not abuse its discretion in denying Tarrer's motion to dismiss because the parties had "good enough" copies of all the original photos, as well as the originals of Tarrer's photo and a few others. VRP (Sept. 1, 2009) at 21. Tarrer cannot demonstrate that the trial court acted unreasonably or based its decision on untenable grounds or reasons in denying his motion to dismiss. Accordingly, we affirm the trial court's order.

Although Tarrer seeks remand to a different trial judge, he fails to adequately demonstrate evidence of the trial judge's actual or potential bias at retrial. We reverse his convictions because of the cumulative effect of multiple instances of prosecutorial misconduct and remand for retrial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Johanson, A.C.J.

We concur:

_____
Penoyar, J.

_____
Bridgewater, J.P.T.