Filed 1/31/25  P. v. Om CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B332863 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA107732) |
| v. | |
| MORRIS OM, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County, Chet L. Taylor, Judge.  Affirmed in part, reversed in part, and remanded.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Eric J. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

In 2017, defendant and appellant Morris Om shot and killed two rival gang members during a physical confrontation inside a liquor store. Defendant was arrested two weeks later after engaging in a high-speed police pursuit with a five-year-old child in his car. Defendant was convicted, among other offenses, of two counts of second degree murder (Pen. Code, § 187, subd. (a)),[1] fleeing a pursuing police vehicle (Veh. Code, § 2800.2), and misdemeanor child abuse (§ 273a, subd. (b)).

Defendant does not challenge the sufficiency of evidence supporting these (or other) convictions on appeal. He instead raises seven contentions challenging the exclusion of evidence, various jury instructions, a remark by the prosecutor during closing argument, and several portions of his sentence. Recognizing most of these contentions were not raised below, defendant argues trial counsel was ineffective in failing to object.

We affirm defendant's convictions but remand the matter for a full resentencing hearing.

## FACTUAL BACKGROUND

We limit our factual background to facts relevant to defendant's contentions and to provide necessary context.

### A. Prosecution Evidence

1. *The Liquor Store Shooting*

The shooting in this case occurred at a liquor store in an area of Long Beach known as Cambodia Town. Among the various gangs claiming territory in Cambodia Town were the

---

[1] Subsequent unspecified references to statutes are to the Penal Code.

2

Asian Boyz Gang (ABZ) and the Tiny Rascals Gang (TRG). According to Long Beach Police Department Detective Udom Sawai, an expert on local gangs, ABZ and TRG were "major rivals" at the time.

On the evening of October 10, 2017, Detective Oscar Valenzuela responded to a shots-fired call at the liquor store. Detective Valenzuela obtained video surveillance from the liquor store and surrounding areas. Footage capturing the confrontation and shooting was played for the jury.[2]

Around 9:23 p.m., Dallas Som and Danny Bunthung exited a pickup truck and walked to the store entrance where Savannara Sok and defendant were standing. Defendant and Sok were members or associates of TRG. Som and Bunthung were members of ABZ. The four men were captured "madd-dogging or staring down" one another outside the store.[3]

Together, the four men entered the liquor store. Sok entered first, followed by Bunthung, defendant, and then Som. Inside the store were a store clerk and customer. After the four men walked through the entryway, they engaged in a "two against two" fistfight. Sok tackled Bunthung to the ground while defendant wrestled with Som nearby. Moments later, defendant and Som were fighting outside the entryway doors. Defendant lost his eyeglasses during the skirmish.

---

[2]     The appellate briefs refer to various portions of surveillance footage, which we have independently reviewed.

[3]     Defendant testified he was a recording artist who sang about TRG gang culture. He believed ABZ called him "The Singing Roach." At the time of incident, defendant and Sok wore clothing associated with TRG. Defendant wore a black jacket and grey t-shirt. Sok wore a Las Vegas Raiders hat.

Once outside, Som disengaged from defendant and ran back to assist Bunthung inside the store. Standing alone outside, defendant reached into his waistband to retrieve a handgun. Defendant then walked back into the liquor store.

Detective Valenzuela testified as to what happened next: "That is going to be, again, the defendant after he ran back inside with a gun. We've got Mr. Bunthung on the ground looking in his direction. Then you have [Mr.] Som in the background, and then Savannara Sok [on the right] getting out of the way." Defendant fired the gun while "standing over the victims" and while Sok was "getting out of the way." Ricocheted projectiles hit the clerk and customer. Defendant and Sok ran away, fleeing the area around 9:24 p.m.

Bunthung and Som died from multiple gunshot wounds. A pathologist who conducted autopsies of both victims testified Bunthung sustained four gunshot wounds to the right eye socket, mouth, right abdomen, and thigh. Som sustained four gunshot wounds to the back of the head, upper back, and a fragment injury to his thigh. The wound to Bunthung's eye socket contained stippling, suggesting defendant's firearm was "probably within the range of six inches to a foot" away when firing. Defendant's eyeglasses, nine expended cartridge cases from a 9-millimeter firearm, and various projectiles were collected from the scene.

2.  *The High-Speed Chase and Subsequent Investigation*

While conducting surveillance around 9:45 a.m. on October 26, 2017, officers watched defendant leave a house and get into a vehicle with a small child, who was later identified as his girlfriend's son. Defendant drove away in the car with the

4

child sitting in the back seat. An officer activated his car's police lights and sirens. Several police cars followed defendant as he drove at high rates of speed on highways and streets. Defendant ran several red lights and stop signs and was seen going "well over 45 to 50 miles an hour" on a residential street. Following a five-to-ten-minute pursuit, defendant's vehicle ran a red light on Pacific Coast Highway and struck another vehicle before coming to rest. Defendant was arrested without further incident.

During a recorded interview with police, defendant displayed his gang-related tattoos and admitted he was a former member of TRG. Defendant denied any involvement in the liquor store shooting.

Officers searched the home from which defendant was seen leaving and recovered parts of a disassembled 9-millimeter Glock handgun. A criminalist reassembled the gun, analyzed the expended cartridge cases collected from the liquor store, and determined each had been fired from the gun. Another criminalist found defendant's DNA on the recovered eyeglasses.

Detective Sawai testified the liquor store shooting was gang related. Members of ABZ and TRG were taught to engage in fights, stabbings, shootings, and murders with rivals "on site, meaning, it could be anywhere, in the store, in public, driving, it could be anywhere, . . ." Detective Sawai testified it would not be unreasonable to expect members of TRG or ABZ to be armed in public, placing everyone in danger of great bodily injury or death.

## B.    Defense Evidence

Defendant testified in his own defense. He admitted shooting Som and Bunthung but claimed he did so in self-defense and in defense of Sok. After initially entering the liquor store,

5

defendant heard someone behind him say, "Roach Killer."[4] Knowing the term referred to ABZ members who kill rivals, defendant feared someone was prepared to kill him. Defendant turned and saw two unknown men (Som and Bunthung) "mad-dogging" him. Defendant believed one of the men reached for his waist. Anticipating an imminent attack, defendant decided to "throw a couple punches and get out of there." At the time, defendant "wasn't thinking" about using his gun "in that kind of [violent] manner."

When fighting with Som, defendant lost his glasses and could not see clearly. Defendant felt a metal object hit his head and "felt, like, a jacket wrapped around [his] neck almost," but was able to "break away" from Som outside the store. Defendant knew Som did not have a gun or weapon in his hand.

While outside the store, defendant "really couldn't see" anything but believed Som went back to "hurt" Sok. Fearing for his friend, defendant went back inside the store despite having the ability to leave. Without seeing either victim with a gun or weapon, but fearing they might be armed, defendant "got a little close" before chambering a round in his gun and firing. Every time he pulled the trigger, defendant feared for Sok's life but not his own.[5] Defendant maintained he was fearful for Sok's life

---

[4] Officer Sawai testified members of ABZ referred to those affiliated with TRG as a "roach."

[5] Asked why he fired his gun on direct examination, defendant testified: "Because they were attacking [Sok], and I was trying to save him." On cross-examination, the prosecutor asked if defendant was afraid for his own life when he prepared his gun for firing. Defendant replied, "No, sir. For [Sok's] life." Defendant continued to fire shots "because [he was] terrified that [his] friend, Savannara Sok, is in imminent danger. . . ."

despite surveillance footage placing Sok away from both victims before the shooting.

Defendant also testified about two prior shootings by members of ABZ in 2008 and 2016. In 2016, defendant was approached by an ABZ member who called out, "Roach Killer," before fighting and then shooting defendant. In 2008, defendant was shot outside a restaurant claimed by ABZ.

## PROCEDURAL BACKGROUND

By amended information, defendant was charged with two counts of murder (§ 187, subd. (a); counts 1–2), two counts of premeditated attempted murder (§§ 664/187, subd. (a); counts 3–4), fleeing a pursuing police vehicle (Veh. Code, § 2800.2; count 5), felony child abuse (§ 273a, subd. (a); count 6), felon in possession of a firearm (§ 29800, subd. (a)(1); count 10), and two counts of assault with a firearm (§ 245, subd. (a)(2); counts 22–23). The information contained special circumstance allegations (§ 190.2, subds. (a)(3), (a)(22); counts 1–2), firearm enhancement allegations (§§ 12022.5, subd. (a), 12022.53, subds. (b)-(d); counts 1–4, 22–23), gang enhancement allegations (§ 186.22, subds. (b)(1)(C), (b)(1)(B); counts 1–4, 22–23); and prior conviction allegations (§§ 667, subds. (a)(1), (d), 1170.12, subd. (b); counts 22-23).[6]

The matter proceeded to trial in January and February 2023. During deliberations, the court granted the prosecution's motion to dismiss the felony child abuse count on count 6 and proceed on the lesser-included offense of misdemeanor child

---

[6] The amended information charged Sok with several offenses. Sok was not tried alongside defendant.

7

abuse (§ 273a, subd. (b)).  The jury acquitted defendant of both attempted murder counts, convicted him on all other counts, found both murders to be of the second degree, and found all sentence enhancement allegations true.[7]  The prosecution dismissed the gang enhancement allegations previously bifurcated by the court.

Defendant was sentenced to 80 years to life plus a consecutive determinate term of 11 years eight months in prison.

## DISCUSSION

### A.     Forfeiture and Ineffective Assistance of Counsel

Defendant acknowledges most of his appellate contentions were not raised below.  We briefly discuss the law on forfeiture and the doctrine upon which defendant relies in the alternative, ineffective assistance of counsel, before addressing each contention below.

"In order to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellate claims, reviewing courts have *required* parties to raise certain issues at the time of [trial and] sentencing.  In such cases, lack of a timely and meaningful objection forfeits . . . the claim." (*People v. Scott* (1994) 9 Cal.4th 331, 351 (*Scott*).)

This principle generally applies to the contentions raised here.  (See *People v. Simon* (2016) 1 Cal.5th 98, 143 [instructional error]; *People v. Hill* (1998) 17 Cal.4th 800, 820 [prosecutorial misconduct]; *Scott, supra,* at p. 351 [sentencing]; Evid. Code, § 354, subd. (a) [exclusion of evidence].)

---

[7]     The jury found both special circumstance allegations under section 190.2, subdivisions (a)(3) and (a)(22), not true.

A criminal defendant "may not, . . . transform a forfeited claim into a cognizable claim merely by asserting ineffective assistance of counsel." (*People v. Jennings* (2010) 50 Cal.4th 616, 654, fn. 15.) An ineffective assistance claim "is different from a claim of the underlying forfeited error" (*ibid.*) and requires the defendant to demonstrate (1) deficient trial counsel performance and (2) resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The former component requires showing "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) The latter component requires establishing a reasonable probability the result of the proceeding would have been different but for trial counsel's errors. (*Id.* at p. 694.)

Given these requirements, "rarely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122 (*Thompson*).) In conducting any ineffective assistance analysis, we defer to trial counsel's reasonable tactical decisions. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) "Counsel is not ineffective for failing to make frivolous or futile motions" (*Thompson*, *supra*, at p. 122), or for failing to object when "there was no sound legal basis for objection." (*People v. Cudjo* (1993) 6 Cal.4th 585, 616.)

## B.     Exclusion of Evidence

Defendant contends the trial court abused its discretion in excluding evidence that one of the murder victims (Bunthung) possessed a firearm during a police interview in 2015. We disagree.

## 1. *Relevant Background*

During its case-in-chief, the prosecution called Sergeant Ricardo Solario to testify about a 2015 conversation in which Bunthung admitted he was a member of ABZ. Prior to calling Sergeant Solario to testify, the prosecutor moved to exclude evidence Bunthung possessed a firearm during the interview. The prosecutor argued Bunthung's firearm possession was irrelevant because (1) there was no evidence Bunthung was armed during the liquor store shooting; and (2) there was no evidence defendant knew Bunthung or his prior firearm possession. Defense counsel argued the evidence was relevant to defendant's "knowledge" that ABZ members carried firearms. The court excluded evidence of Bunthung's firearm possession but permitted questioning on ABZ and its members carrying firearms.

## 2. *Analysis*

Defendant contends the court's exclusion of Bunthung's prior firearm possession violated Evidence Code section 1103, subdivision (a)(1). That provision furnishes an exception to the character evidence rule in criminal actions if "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

The Attorney General contends defendant forfeited this contention by failing to object on this ground below. We agree. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435; see Evid. Code, §§ 353–354.)

Even on the merits, we discern no error in excluding evidence of Bunthung's prior firearm possession. Under Evidence

Code section 1103, subdivision (a)(1), such evidence would be relevant only to demonstrate (1) defendant's knowledge of Bunthung's firearm possession affected his mental state; or (2) if defendant did not have personal knowledge, the evidence tended to show Bunthung was "'probably the aggressor.'" (*People v. DelRio* (2020) 54 Cal.App.5th 47, 55–56 (*DelRio*).) Neither scenario applies in this case.

It is undisputed defendant did not know Bunthung or of his prior contact with law enforcement. As such, Bunthung's firearm possession could not be relevant to defendant's own state of mind. (*People v. Tafoya* (2004) 42 Cal.4th 147, 165.)

Nor has defendant demonstrated how the evidence was relevant to show Bunthung was "probably the aggressor" of the physical confrontation or subsequent shooting. (*Delrio*, *supra*, 54 Cal.App.5th at p. 55.) Unlike the scenario presented in *Delrio*, on which defendant principally relies, this is not a case in which "[w]e are uncertain what happened at the scene." (See *id.* at pp. 56–57 ["Who drew [their gun] first? That question is key"].) Nothing in the surveillance footage suggests Bunthung (or Som) initiated the physical confrontation or deadly force. "If it clearly appears that the defendant was the aggressor . . . , evidence of prior acts of violence . . . by the deceased is not admissible." (*People v. Soules* (1940) 41 Cal.App.2d 298, 307 (*Soules*).)

Defendant's unsupported statements that one of the victims (presumably Bunthung or Sok) reached for or used a weapon did not support the exception codified in Evidence Code section 1103, subdivision (a)(1). Under this limited exception, "'[t]here must be some evidence of some overt act on the part of deceased, of such character as would *per se* be indicative of dangerous intentions, or it must be shown affirmatively to have

been done under circumstances such as to have reasonably led to a belief that it was of that character.'" (*Soules*, *supra*, 41 Cal.App.2d at p. 307.) Defendant has not identified any such evidence in this case.

On a more fundamental level, we fail to see how Bunthung's prior firearm possession tended to prove his character for violence. Bunthung indisputably did *not* carry or wield a firearm or weapon inside the liquor store. It thus follows that the proffered evidence (i.e., Bunthung's prior firearm possession) could not be used to "prove conduct of [Bunthung] in conformity with" this character trait (i.e., possessing a firearm). (Evid. Code, § 1103, subd. (a)(1).) Even assuming it could, the evidence established Bunthung's propensity to carry a firearm. It did not tend to prove that Bunthung had a propensity to engage in "two against one" fistfights as defendant argues on appeal. (See also *Staples v. U.S.* (1994) 511 U.S. 600, 611 ["despite their potential for harm, guns generally can be owned in perfect innocence"]; § 667.5, subd. (c) [possession of firearm not among crimes defined as "violent felonies"].)

The cases on which defendant relies apply Evidence Code section 1103, subdivision (a)(1), when the prior violent act(s) parallel the circumstances under which the defendants claimed self-defense. (See, e.g., *DelRio*, *supra*, 54 Cal.App.5th at pp. 54–56 [prior domestic violence including use of a firearm relevant to victim's propensity to initiate gunfight]; *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 449 [prior attack relevant to theory victim "attacked [the defendant] in the bedroom"].) As discussed, Bunthung's prior firearm possession did not relate to defendant's offer of proof. We decline to apply Evidence Code section 1103 beyond this limited circumstance.

12

We thus conclude the court acted within its discretion in excluding evidence of Bunthung's prior possession of a firearm. As such, we further conclude defense counsel was not ineffective for failing to object under Evidence Code section 1103.  (See *Thompson*, *supra*, 49 Cal.4th at p. 122.)

## C.     Claims of Instructional Error

Defendant challenges three CALCRIM instructions given to the jury: No. 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor); No. 3472 (Right to Self-Defense: May Not Be Contrived); and No. 250 (Union of Act and Intent: General Intent).  We address the first two instructions on the right to self-defense before addressing the third instruction on general intent.

### 1.     *CALCRIM Nos. 3471 and 3472*

Defendant contends the trial court erred in failing to instruct the jury with bracketed language in CALCRIM Nos. 3471 and 3472 on the victim's sudden escalation of deadly force. Defendant argues the bracketed language was warranted because he engaged in nondeadly behavior that was met by life-threatening escalation by Bunthung and Som.  We disagree.

#### a.     *Relevant Background*

Defendant offered two defense theories at trial.  He argued the need to employ physical and deadly force was necessary to defend *his own* life and to protect *Sok's* life.[8]  With defense

---

[8]     Defendant's appellate briefs conflate these two theories without explanation.  Defendant's briefs do admit, however, that defendant shot both victims "because they were attacking Sok, and [defendant]

13

counsel's approval, the court instructed the jury with CALCRIM No. 3471 as follows:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tries to stop fighting; [¶] 2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; [¶] AND [¶] 3. He gives his opponent a chance to stop fighting. [¶] If a person meets these requirements, he then had a right to self-defense if the opponent continued to fight."

The court also instructed the jury with CALCRIM No. 3472, which provided: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." In addition, the court instructed the jury on principles of homicide and murder (CALCRIM Nos. 500, 520–522), justifiable homicide based on self-defense or defense of another (CALCRIM No. 505), and voluntary manslaughter based on imperfect self-defense or defense of another (CALCRIM No. 571).

Addressing both instructions at issue in opening and rebuttal closing argument, the prosecutor argued defendant was not entitled to self-defense because the victims "were not the aggressors" and the evidence failed to establish any escalation of force. The prosecutor also argued imperfect self-defense "does not apply when the defendant, through his own wrongful conduct has created circumstances that justify his adversary's use of force.

---

feared that Sok was going to be killed or gravely injured if he (appellant) did not intervene with deadly force."

Him and Sok started a fist fight.  You don't get to shoot people you started a fist fight with.  [¶]  [CALCRIM No. 571], imperfect self-defense: Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be."

Defense counsel discussed both self-defense and defense of another in closing.  Counsel argued defendant "believed [Som] had a weapon, the metal object.  He has past experience with [ABZ] that they will escalate a fight to a shooting. . . . [Defendant] believed Som and Bunthung were going to inflict [*sic*] great bodily injury on or kill Savannara Sok.  Why wouldn't they?  They are [ABZ]."

During deliberations, the jury submitted a question requesting clarification of the term "'lawful excuse' in reference to the phrase 'he killed without lawful excuse?"  In response, the court referred the jury to CALCRIM Nos. 500, 505, and 571.

> b.  *Governing Law: Self-Defense and Defense of Another*

"We begin by reviewing the related concepts of *self-defense* and *defense of others*. . . .  For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.  [Citation.]  A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide.  [Citations.]" (*People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*), overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172.)  For imperfect self-defense, one must "*actually,* but unreasonably" believe in the necessity of defending oneself from imminent death or great bodily injury.  (*Id.* at p. 995.)  A killing committed in imperfect self-defense negates malice and may result in a

15

conviction "'of no crime greater than voluntary manslaughter.' [Citation.]" (*Ibid.*) "For either perfect or imperfect self-defense, the fear must be of imminent danger to life or great bodily injury." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 689 (*Chavez*); accord, *In re Christian S.* (1994) 7 Cal.4th 768, 771.)

"For the same reason[s], one who kills in imperfect *defense of others*—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter." (*Randle*, *supra*, 35 Cal.4th at p. 997.) For this theory to apply, the "defendant must . . . actually believe the immediate use of deadly force was necessary to defend another person against the danger of being killed or suffering great bodily injury." (*Chavez*, *supra*, 22 Cal.App.5th at p. 659.) "Imperfect defense of others, like imperfect self-defense, is not a true defense, but a shorthand description for a form of voluntary manslaughter." (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

Our Supreme Court has long explained the self-defense doctrine "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Enraca* (2012) 53 Cal.4th 735, 761.)

c. *Analysis*

Defendant contends the trial court erred by instructing the jury with CALCRIM Nos. 3471 and 3472 without bracketed language concerning the right to self-defense if an opponent suddenly responds to a nondeadly physical confrontation with

16

deadly force.[9] Without this bracketed language, defendant argues the jury was "misled into thinking [he] was unduly restricted in his ability to claim self-defense."

The Attorney General contends defendant forfeited this contention for the failure to request the language to amplify or clarify each instruction. We agree. (See *People v. Jennings* (2010) 50 Cal.4th 616, 671; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 (*Eulian*).) Anticipating this result, defendant contends his trial counsel was ineffective for not requesting the bracketed language.

Defendant's argument primarily relies on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*). There, two codefendants and another gang member instigated a fistfight with seven-to-eight rival gang members. (*Id.* at p. 944.) One of the codefendants testified that when he saw one rival member draw an object that appeared to be a gun, he pulled out his own firearm and fatally shot the rival member in self-defense. (*Ibid.*) During closing argument, the prosecutor repeatedly misstated the law by arguing CALCRIM No. 3472 precluded the shooter's claim of self-defense even if he sought only to engage in a fistfight. (*Id.* at pp. 943, 946–949.)

Over a lengthy dissent, the majority in *Ramirez* held the "blanket rule" in CALCRIM No. 3472 did not accurately state the law "under the facts before the jury." (*Ramirez, supra,* 233

---

9       The bracketed language in CALCRIM Nos. 3471 and 3472 provides: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting."

Cal.App.4th at p. 947.) Without the bracketed language on the escalation of deadly force, the court found the instructions "established as a matter of law that defendants were not entitled to imperfect self-defense if they contrived to use *any* force, even nondeadly force, but that was a question for the jury to decide on its own evaluation of the facts." (*Id.* at p. 953.)

Defendant misapplies *Ramirez* to the facts and theories of this case. In *Ramirez*, the "court was concerned with a defendant's use of deadly force in self-defense." (*Eulian*, *supra*, 247 Cal.App.4th at p. 1334.) The instruction it analyzed (CALCRIM No. 3472) was given because the evidence warranted the self-defense instruction.

In this case, defendant's excuse for employing deadly force was not based in self-defense. The only evidence offered to support defendant's shooting was "[b]ecause they [(the victims)] were attacking Mr. Savannara, and I was trying to save him." Throughout trial and as acknowledged on appeal (see fns. 5, 8 *ante*), defendant's claimed need to shoot the victims was to save Sok's life, not his own. As defendant does not explain why the self-defense instructions in this case (CALCRIM Nos. 3471-3472) warranted language on the escalation of force when his sole theory was employing deadly force in defense of another, we join the breadth of cases cabining *Ramirez* to its own facts. (See *People v. Gray* (2023) 15 Cal.5th 152, 169, fn. 5 [""[i]t is axiomatic that cases are no authority for propositions not considered""].)

Defendant raises no challenges to the instructions given on perfect or imperfect defense of another. (See CALCRIM Nos. 505, 571, 3474.) He notes that one of these instructions (CALCRIM No. 505 [Justifiable Homicide: Self-Defense or Defense of

18

Another]) did instruct the jury on the escalation of force, though it did not extend escalation of force to defense of another.[10] The jury was directed to this instruction when seeking clarification on "'lawful excuse' in reference to the phrase 'he killed without lawful excuse?'"

In light of the foregoing, we discern no error in omitting the bracketed language in CALCRIM Nos. 3471 and 3472. We thus discern no error or resulting prejudice in defense counsel's failure to request it.

### 2.  *CALCRIM No. 250*

Defendant contends the court erred by listing child abuse as a general intent crime in CALCRIM No. 250 (Union of Act and Intent: General Intent). Defendant argues the only theory of child abuse applicable in this case was indirect child abuse, which required the additional finding of criminal negligence. Again, we discern no error.

### a.  *Relevant Background*

Defendant was charged with felony child abuse (§ 273a, subd. (a)) for placing a young child in danger of serious harm

---

[10]  CALCRIM No. 505 provided, inter alia: "A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating. [¶] If the victim responds with a sudden escalation of force the aggressor may legally defend against the use of force. [¶] The doctrine of self-defense is available to insulate one from criminal responsibility where his or her act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander."

19

during the high-speed police chase. Both parties argued this theory at trial.

The jury received three instructions on the union of act and intent: CALCRIM Nos. 250, 251, and 253.

The first instruction informed the jury on the union of act and *general* intent as follows:

> "The crimes of Child Abuse, Possession of Firearm by a Felon, and Assault with a Firearm, require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of any of these crimes, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act. The act required is explained in the instruction for that crime . . . ." (CALCRIM No. 250.)

The second instruction informed the jury on the union of act and *specific* intent for various offenses not relevant here. (CALCRIM No. 251.)

The third instruction informed the jury on the union of act and *criminal negligence* as follows:

> "For you to find a person guilty of the crime of Child Abuse, a person must do an act with criminal negligence. [¶] Criminal negligence is defined in the instructions on that crime." (CALCRIM No. 253.)

For the particular charge of child abuse, the court instructed the jury with CALCRIM Nos. 821 (felony child abuse) and 823 (misdemeanor child abuse). The latter instruction provided:

> "Child abuse in violation of Penal Code section 273a(b), a misdemeanor, is a lesser offense of [felony

20

child abuse] in violation of Penal Code section 273a(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant, while having care or custody of a child, willfully caused or permitted the child to be placed in a situation where the child's person or health was endangered; [¶] AND [¶] 2. The defendant was criminally negligent when he caused or permitted the child to suffer, be injured, or be endangered. [¶] . . . [¶]

*Criminal negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act in the same situation; [¶] 2. The person's acts amount to disregard for human life or indifference to the consequences of his or her acts; [¶] AND [¶] 3. A reasonable person would have known that acting in that way would naturally and probably result in harm to others."

The court instructed the jury to consider "all of these instructions . . . together" and follow the definitions provided in them. (CALCRIM No. 200; see also CALCRIM Nos. 220, 3519.)

During deliberation, the jury submitted the following question: "In regards [*sic*] to count 6 [felony child abuse,] if we all agree the defendant is guilty of a misdemeanor but can't agree on the felony—do we convict on the lesser count or find undecided?" In response, the prosecutor moved to dismiss the felony charge and proceed on the misdemeanor offense. The court dismissed the felony charge before answering the jury's question as follows: "Count 6, the felony, P.C. 273a(a) has been dismissed and is no

21

longer before you; only the lesser offense, Penal Code 273a(b), the misdemeanor is before you for your consideration."

b.      *Governing Principles of Child Abuse*

"Section 273a encompasses a wide variety of situations and includes both direct and indirect conduct.  [Citations.]  When the harm to a child is directly inflicted, the requisite mental state for the section 273a offense is general criminal intent.  [Citations.]  When that harm is indirectly inflicted, the requisite mental state is criminal negligence.  [Citations.]"  (*People v. Burton* (2006) 143 Cal.App.4th 447, 454; see also *People v. Sargent* (1999) 19 Cal.4th 1206, 1219–1220.)

"In criminal law, there are two descriptions of criminal intent: general intent and specific intent.  '"A crime is characterized as a 'general intent' crime when the required mental state entails only an intent to do the act that causes the harm; a crime is characterized as a 'specific intent' crime when the required mental state entails an intent to cause the resulting harm."'"  (*People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1172–1173 (*Nicolas*).)  "Criminal negligence is a *separate* mental state that is distinct from either general or specific intent."  (*Id.* at p. 1173, italics added.)  Whenever a charged crime requires criminal negligence, "the trial court should instruct the jury on the union between the act and a defendant's criminal negligence."  (*Ibid.*)

c.      *Analysis*

Defendant contends CALCRIM No. 250 improperly listed child abuse as a general intent crime because the "the type of child abuse [he] allegedly committed was indirect."

The Attorney General contends defendant forfeited this contention for failing to object at trial or request a curative instruction. We agree. (See *People v. Ramirez* (2006) 39 Cal.4th 398, 469 [defendant must request clarifying language for any instruction he believed was unclear].)

Even on the merits, we discern no instructional error. As discussed, we must consider the challenged instruction "'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

We conclude there is no reasonable likelihood the jury followed CALCRIM No. 250 in a manner that removed criminal negligence from its consideration and finding. CALCRIM No. 250 is not a self-supporting instruction. Despite generally requiring the joint operation of "act and wrongful intent" for child abuse, the instruction did not define the act required for the offense, and instead directed the jury to the "instruction for that crime." This direction to the "instruction for that crime" appears again in CALCRIM No. 253, another introductory instruction on the union of act and criminal negligence for child abuse, and in CALCRIM No. 225 on the intent and mental state required for each offense. After dismissing the felony child abuse charge during deliberations, the court directed the jury to consider "only the lesser offense, Penal Code 273a(b), the misdemeanor . . . ." The instruction "on that crime"—CALCRIM No. 823—required both an intentional act and criminal negligence.

Assuming the jury recognized a conflict between CALCRIM No. 250 and the more precise, CALCRIM Nos. 253 and 823 (see *Nicolas, supra,* 8 Cal.App.5th at p. 1173), we find no reasonable

23

probability it would have concluded the single, more general instruction prevailed over the numerous and more specific instructions. (See *Mitchell*, *supra*, 7 Cal.5th at pp. 581–582 [reviewing courts consider instructions that "more specifically" address legal concept than more generalized instructions]; accord, *id.* at pp. 581–582; *People v. Rogers* (2006) 39 Cal.4th 826, 873–874.)

## D. Prosecutorial Misconduct

Defendant contends the prosecutor engaged in misconduct by telling the jury in rebuttal closing argument: "Every time you hear a guilty verdict in a criminal case, this flag represents something."

The Attorney General contends, defendant concedes, and we agree defendant's direct claim of error is forfeited. (See *People v. Davis* (2009) 46 Cal.4th 539, 612 (*Davis*).)

Defendant argues his trial counsel was ineffective in failing to object to this statement. We disagree.

Claims of prosecutorial misconduct implicate different standards under federal and state law. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070.) "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and "'it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct'" [citation]." (*Davis*, *supra*, 46 Cal.4th at p. 612.)

24

Like claims of instructional error, claims of prosecutorial misconduct in closing argument must be viewed "in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) We shall not "'lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1225, fn. 21, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682.)

Here, defendant challenges an isolated statement in the following portion of rebuttal argument:

"I know at some point, especially during jury selection, there was a little bit of humor and release. . . . Please do not take the laughs or jokes as signs of disrespect. . . .

"You all received jury summons. I know, some of you, it is your first time. I hope you do walk away with a greater appreciation of this system, of the process, of all the lengths we go through. *Every time you hear a guilty verdict in a criminal case, this flag represents something.* I know there is a lot of heartbreaking news out there. Things are not perfect, but this system works, and we could not do it without you.

"People think, in criminal law, everything is hate, like, adversarial between the prosecution and defense. I hope you also see the criminal law practice . . . is a very small group of attorneys that do this. There is a high level of respect. We may disagree [on] the outcomes, but I hope you get to see, we're not fighting over money here." (Italics added.)

Defendant contends the italicized statement appealed to the passion and prejudice of the jury. (Citing *People v. Young* (2005) 34 Cal.4th 1149, 1195 [prosecutor may not inflame or arouse passion or prejudice of the jury]; *United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149 [prosecutor may not argue "potential social ramifications of the jury's reaching a guilty verdict"].) Viewed properly in context, we disagree.

The prosecutor's remarks sought to dispel any appearance of disrespect or incivility between counsel. The remarks also expressed gratitude to the jury for facing "the onerous task . . . in applying the law and in fulfilling its important function." (*People v. Cornwell* (2005) 37 Cal.4th 50, 91–92 [no misconduct when commenting on rule of law and jury service], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390.)

To the extent the isolated remark was unduly suggestive of patriotism, the jury was instructed not to let "bias, sympathy, prejudice, or public opinion influence [its] assessment of the evidence or [its] decision." (CALCRIM No. 200.) We presume the jury followed this instruction. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

*State v. Perez-Mejia* (Wash. Ct. App. 2006) 143 P.3d 838 (*Perez-Mejia*), on which defendant relies, is both nonbinding and inapposite. (See *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 175.) In that case, the prosecutor told the jury in summation:

> "Send a message to [one of the defendants,] to other members of his gang . . . and to all the other people who choose to dwell in the underworld of gangs. That message is we had enough. We will not tolerate it any

26

longer. That we as citizens . . . , we have the
right to life, liberty and the pursuit of
happiness and we will no longer allow those
who choose to dwell in the underworld of gangs
to stifle our rights. And that message begins
now. [¶] It begins now by finding that the
defendant was involved in the death of [an
innocent bystander]. That message can be sent
by holding the defendant responsible for his
actions, for his involvement in the gang."
(*Perez-Mejia*, *supra*, 143 P.3d at p. 844.)

The court in *Perez-Mejia* found these comments "improperly
invoked the jurors' patriotic sentiments and, having done so, cast
the defendant as an oppressor of the inalienable rights listed in
our nation's Declaration of Independence." (*Perez-Mejia*, *supra*,
143 P.3d at p. 844.) In so finding, the court reasoned the
argument "needlessly injected the sensitive issues of nationality
and ethnicity into a case where the defendant and his associates
were alleged members of a Central American gang, many of
whom, including [one defendant who] required Spanish language
interpreters during the trial." (*Id.* at p. 844.)

The prosecutor's remark in this case was not directed at
defendant, his nationality, ethnicity, or membership in a gang.[11]
The prosecutor's generalized statement, made in context of a

---

[11] When discussing the prohibition against appealing to
"patriotism," the *Perez-Mejia* court cited analogous cases prohibiting "a
prosecutor to 'direct the jurors' desires to end a social problem toward
convicting a particular defendant.'" (*Perez-Mejia*, *supra*, 143 P.3d at
p. 843, fn. 8, quoting *United States v. Solivan* (6th Cir. 1991) 937 F.2d
1146, 1148, 1153 [prosecutor requested sending a message to the
defendant *and all of the other drug dealers like her . . . [t]hat we don't
want that stuff in Northern Kentucky*].)

27

larger discussion on jury service and civility, was not a plea to patriotic sentiment like that in *Perez-Mejia*. We discern no prosecutorial misconduct or ineffective assistance.

## E.   Claim(s) of Sentencing Error

Defendant raises two claims of sentencing error. He first contends the trial court erroneously imposed consecutive sentences on count 5 (evading a pursuing vehicle) and count 6 (misdemeanor child abuse). He also contends the court abused its discretion in refusing to dismiss the firearm enhancements on counts 1, 2, 22, and 23 in furtherance of justice (§ 1385, subd. (c)).

The Attorney General concedes error in the former argument. We accept the concession.

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

Whether a defendant may be subject to multiple punishments under section 654 "requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).) We consider whether the different crimes "were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if [the court] conclude[s] that the case involves more than a single act—i.e., a course of conduct—do[es it] then consider

28

whether that course of conduct reflects a single "'intent and objective'" or multiple intents and objectives." (*Ibid.*)

Here, the parties agree defendant's convictions on counts 5 and 6 were based on the same course of conduct of evading the police while having a young child in his car. Neither of these crimes were completed before the other and instead comprised a continuous act. We agree section 654 precluded multiple punishment. (See *Corpening*, *supra*, 2 Cal.5th at pp. 313–315.)

The parties further agree, as do we, that we must remand the matter for the trial court to exercise its discretion under section 654, which "creates sufficiently "'changed circumstances'" [citation] to warrant a full resentencing." (*People v. Jones* (2022) 79 Cal.App.5th 37, 46, quoting *People v. Buycks* (2018) 5 Cal.5th 857, 893.) In light of our conclusion, we need not decide defendant's latter claim of sentencing. On remand, defendant may request, and the court may consider, striking the firearm enhancements in furtherance of justice. (See *People v. Walker* (2024) 16 Cal.5th 1024 (*Walker*).[12]

---

[12] Absent a finding that dismissal would endanger public safety on remand, the trial court retains the discretion to impose or dismiss enhancements, "provided that it assigns significant value to the enumerated mitigating circumstances when they are present. [Citation.] In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' [Citation.]" (*Walker*, *supra*, 16 Cal.5th at p. 1029; accord, *id.* at pp. 1036, 1037.)

## DISPOSITION

Defendant's convictions are affirmed. Defendant's sentence is vacated and the matter is remanded for full resentencing. We express no opinion on the court's exercise of discretion on remand. Following resentencing, the court shall prepare an amended abstract of judgment and forward a copy to the California Department of Corrections and Rehabilitation.

MORI, J.

We concur:

CURREY, P. J.

ZUKIN, J.

30